John JALOWY

v.

The FRIENDLY HOME, INC. et al.

No. 2001–238–Appeal.

Supreme Court of Rhode Island.

March 26, 2003.

Thomas Dickinson, Providence, Bruce P. Gladstein, Avon, CT, for Plaintiff.

Thomas R. Bender, Joseph A. Rotella/James T. Murphy, Providence, for Defendant.

Present: WILLIAMS, C.J., FLANDERS, and GOLDBERG, JJ.

## O P I N I O N

FLANDERS, Justice.

This is· a case about an unwelcome visitor to an unfriendly nursing home. At least this is how the parties perceived each other. Although the defendant nursing home dubbed itself "The Friendly Home, Inc." (home), this euphonic appellation proved to be a particularly galling misno-

mer to the plaintiff, John Jalowy (Jalowy). Indeed, the parties' dealings with each other in late 1992 and early 1993 could be characterized in many different ways, but "friendly" was not one of them. At that time, Jalowy's mother, Stacia Jalowy, was a resident of the home, an assisted-living facility for elderly residents in Woonsocket. According to Jalowy, the home unlawfully retaliated against him for complaining about its nurses—and tortiously inflicted him with emotional distress—when it barred him for six weeks in 1993 from visiting his mother there. The home, however, contended that, in doing so, it merely was protecting its residents and staff from Jalowy's increasingly rancorous visits, during which, among other hostile confrontations and recriminations, he called one nurse a "pencil-pushing bitch" and threatened another by raising his fist to her face. Ultimately, a Superior Court jury tasted this curdled milk of human kindness before spitting out a split verdict that pleased neither side.[1]

In February 1993, approximately one month after he was given the boot, Jalowy filed a Superior Court lawsuit against the home and its administrator, defendant Angelo Rotella (collectively, defendants). He alleged that, in barring him from the premises, defendants had retaliated against him in violation of the Abuse in Health Care Facilities Act, G.L.1956 chapter 17.8 of title 23 (the act). Eventually, he also accused defendants of intentional and negligent infliction of emotional distress. After hearing the evidence at trial, a Superior Court jury answered the court's written interrogatories concerning these claims. The jury found in favor of

defendants on the retaliation claim, but for Jalowy on his emotional-distress claims. Although the jury awarded him no compensatory damages, it found defendants liable for $50,001 in punitive damages on Jalowy's claim for intentional infliction of emotional distress. Thereafter, Jalowy moved for judgment notwithstanding the verdict or for a new trial on the retaliation claim, and for an additur and a new trial on the emotional-distress claims. The defendants responded by moving for judgment as a matter of law on the claim of intentional infliction of emotional distress. The trial justice denied Jalowy's motions, but, notwithstanding the jury's verdict, he granted defendants judgment as a matter of law on the claim of intentional infliction of emotional distress. Jalowy has appealed from that judgment.

## Facts and Travel

Jalowy's mother, Stacia Jalowy, became a resident of the home in 1992. She lived there until her death in 1997. Jalowy had wanted her to move into his own house with him, but his brother, Joseph, who was their mother's legal guardian, decided instead to move her into the home.[2] During 1992, Jalowy regularly visited with his mother at the home, seeing her there several times each week. While visiting, he observed how certain members of the home's nursing staff were disporting themselves on the premises, concluding that their behavior was unprofessional and harmful to the residents. This led him to discharge a volley of verbal and written complaints concerning the home and its nurses. Initially, on May 5, 1992, he wrote a letter to the home's management, con-

---

1. William Shakespeare, Macbeth, act. 1, sc. 5 (Lady Macbeth: "[Y]et do I fear thy nature; It is too full o' th' milk of human kindness / To catch the nearest way.").

2. Jalowy had challenged Joseph's appointment as their mother's guardian in 1991 court proceedings, and later filed objections in the probate court concerning Joseph's accounting with regard to his mother's estate.

tending that two staff nurses, Joan Thibault and Maureen Stone, were regularly "smoking and socializing" and causing "a detriment to the elderly people * * *." He also met with Rotella to discuss what he had written in the letter. After the meeting, another incident occurred in which Jalowy observed the same two nurses ignore "two very helpless people * * * [who were] begging for help." After this event, Jalowy called the State Department of Health and the Department of Elderly Affairs to report what he had witnessed at the home. On August 28, 1992, he also sent a letter detailing this episode to the attention of the Department ·of Elderly Affairs.

On December 31, 1992, as Jalowy was departing the home, he encountered the two nurses that he had complained about previously. He suspected that they had been following him around the premises and making fun of him. The particulars of this incident were sharply disputed at trial, but from defendants' standpoint, it climaxed when Jalowy angrily confronted the nurses, swore at one of them, then brandished his fist in the face of the other. In any event, this New Year's Eve imbroglio proved to be the final straw that broke defendants' willingness to allow Jalowy to continue visiting his mother at the home. Thus, the next day, on January 1, 1993, Rotella told Jalowy:

> "You are no longer welcome [at the home]. Go out and get a court order. Do whatever you need to. You can visit your mother at your brother's house, sister's house. We can't allow you to be here. It's not a safe situation."

Approximately one month later, on February 2, 1993, Jalowy took up Rotella on his suggestion and went to Superior Court seeking injunctive relief and damages. There, he obtained the court order that Rotella indicated would be required for his readmission to the home as a visitor. His complaint alleged that Rotella and the home violated § 23–17.8–5 by retaliating against him for reporting instances of abuse and neglect at the home. He also alleged that they violated his "Constitutional Freedom of Association." A Superior Court justice issued an order temporarily enjoining defendants from barring Jalowy from visiting with his mother at the home. With the cooperation of counsel for the parties, the court set up an agreed-upon schedule allowing Jalowy to visit his mother in the home's lobby three days a week for one hour each visit. The parties amended this schedule of visits several times, but it remained substantially the same throughout the pendency of the lawsuit, until Jalowy's mother died in 1997.

In 1995, the Superior Court entered summary judgment for defendants on Jalowy's constitutional claim. Four years later, in 1999, Jalowy moved to amend his complaint to include claims for intentional and negligent infliction of emotional distress against both defendants, which the court granted.

As previously stated, the parties eventually tried the statutory retaliation and the common-law emotional-distress claims before a jury. In response to written interrogatories, the jury found for defendants on the retaliation charge, but for Jalowy on both emotional-distress claims. The jury awarded Jalowy no compensatory damages, but it held defendants liable for punitive damages on the intentional-infliction-of-emotional-distress claim in the amounts of $25,000 against the home and $25,001 against Rotella.

Thereafter, Jalowy moved for judgment notwithstanding the verdict or for a new trial on the retaliation claim, and for an additur and a new trial on the emotional-distress claims. The defendants filed a

motion under Rule 50(b) of the Superior Court Rules of Civil Procedure for judgment as a matter of law on the claim of intentional infliction of emotional distress. In a written decision, the trial justice denied Jalowy's requests but granted defendants' motion. He then entered a judgment providing "[t]hat plaintiff * * * take nothing, [and] that the action be dismissed on the merits," from which Jalowy has appealed. Although the parties have argued other issues on appeal besides the ones we address below, because of our disposition of these issues it is unnecessary for us to reach these other alleged errors and arguments.

## Retaliation Under the Abuse in Health Care Facilities Act

Jalowy first argues that the trial justice erred in refusing to grant him judgment notwithstanding the verdict or a new trial with respect to his claim that defendants retaliated against him for filing a report alleging a violation of the act. The trial justice denied Jalowy's motion on two grounds: (1) that Jalowy never filed a report containing sufficient information to warrant statutory protection under the act from retaliation; and (2) that, even if he did file such a report, the evidence adduced at trial was such that reasonable jurors could differ on whether Jalowy's banishment was the product of retaliation for his complaints to governmental authorities, or whether it was simply a legitimate response—however wrong-headed and heavy-handed—to what the home perceived to be Jalowy's threatening and disruptive behavior when he was on the premises as a visitor. In other words, the trial justice believed that a reasonable jury could conclude from the evidence introduced at the trial that the home had imposed the banishment sanction in question for reasons other than to retaliate for Jalowy's complaints about the nurses.

Jalowy contends that, as a person who was not required to file a report under the act, he was not obliged to provide all the information that the act requires in a report to obtain the statutory protection from retaliation. Further, he argues, he was entitled to a rebuttable presumption that defendants' actions were retaliatory, and that defendants failed to rebut that presumption.

■ We agree with Jalowy that the trial justice erred in finding that the act did not entitle him to assert a claim for retaliation merely because his complaints did not meet all the statutory requirements that a report to the Department of Health must contain, as outlined in § 23–17.8–2. Section 23–17.8–5(b) of the act provides protection against retaliation even to those who were merely "about to make a report." In this case, Jalowy introduced enough evidence that a jury could have found that he was, at a minimum, about to make a report. He testified that he wrote a letter to the home voicing concern that the nurses were neglecting their duties, telephoned the Departments of Health and Elderly Affairs to report an incident of alleged neglect at the home, and even sent a letter addressing this incident to the Department of Elderly Affairs. Thus, the act provided him with protection against retaliation for these acts, despite the fact that he never filed a formal report that included all the statutorily specified information that such reports must contain.

■ We also agree with Jalowy's contention that, having filed one or more reports under the statute—however incomplete they may have been—he was thereby entitled to sue for relief under the statute and to obtain the benefit at trial of a rebuttable presumption that his banishment from the home amounted to retaliation. *See* § 23–17.8–5(b) ("Where a facility

discharges, demotes, or retaliates by any other means against a person after he or she has made a report, testified, or was subpoenaed to testify as a result of a report required by this chapter, there shall be a rebuttable presumption that the facility discharged, demoted, or retaliated against that person as a result of his or her report or testimony."). But when Jalowy failed to request such an instruction, the trial justice instructed the jury that defendants had "no obligation to prove anything" and that the "burden is upon Mr. Jalowy to prove his claim to you." Although this instruction was erroneous with respect to Jalowy's retaliation claim because it failed to accord Jalowy the benefit of the statutory presumption, Jalowy did not object to it. As a result, the instruction as read became the law of the case. *See, e.g., Habib v. Empire Productions, Inc.,* 739 A.2d 662, 665 (R.I. 1999)(per curiam). And even though Jalowy belatedly attempted to argue this point in connection with his post-verdict motions, the trial justice did not err in refusing to apply the presumption in deciding these motions after previously instructing the jury as he did. This is so because Jalowy had waived any right to obtain the benefit of this presumption when he failed to request an appropriate jury instruction on this point and when he failed to object to the court's jury instructions that did not accord him the benefit of the statutory presumption. *Id.* Thus, according to the court's unobjected-to but erroneous instructions, Jalowy bore the burden of proving defendants' retaliatory motive in barring him from the home without the benefit of the statutory presumption.

■ But even if Jalowy had requested an appropriate jury instruction on the statutory presumption and had objected on a timely basis to the court's proposed instructions that failed to instruct the jury accordingly—and even if the court thereafter had instructed the jury about the statutory presumption of retaliation—such a presumption would have been rebuttable by defendants. *See* § 23–17.8–5(b). And here, most tellingly, defendants introduced sufficient evidence for the jury to find that, presumption or no, defendants' actions toward Jalowy were not in fact taken in retaliation for his complaints about the nurses. For instance, Maureen Stone, one of the home's nurses, testified that Jalowy "would insult the aides," and was uncooperative with the staff during his visits to the home. Stone further testified that, on the night before defendants terminated his visitation privileges, Jalowy had called one nurse a "pencil-pushing bitch" and then put his fist to Stone's face and said "And you, too." Rotella testified that he had received complaints from the staff that, while visiting his mother, Jalowy had attempted to feed another resident and was, in general, "running rampage around the facility." Thus, "[b]ased upon the information that was given to [him] by [his] staff," Rotella "felt [plaintiff] was a threat to the safety and welfare of the patients and employees." The jury could have relied upon such evidence in concluding that defendants' decision to exclude Jalowy from the home was not triggered by a retaliatory motive keyed to his complaints about the home's supposedly lazy and heartless nurses, but rather by defendants' legitimate concern for the safety and security of the home's staff and residents—irrespective of whether Jalowy had complained to various authorities about some of the nurses' conduct.

Furthermore, as the trial justice correctly noted, this evidence was such that reasonable minds could differ on whether the home's action in barring Jalowy from the premises was in retaliation for Jalowy's reporting activity or was merely a legitimate administrative response designed to

protect the staff and residents from the threatening acts of a perceived trouble-maker. *Skaling v. Aetna Insurance Co.,* 742 A.2d 282, 288 (R.I.1999). Thus, despite the court's failure to instruct the jury about the statutory presumption, we affirm the trial justice's decision not to grant Jalowy's motion for judgment notwithstanding the verdict on the retaliation claim. *Id.*

■ With regard to the trial justice's decision denying Jalowy's alternate motion for a new trial, we conclude that by rejecting it cursorily in a few scant, conclusory sentences, he failed to independently weigh the evidence, to pass on the credibility of witnesses, and to draw reasonable inferences therefrom, as we require. See, *e.g., Long v. Atlantic PBS, Inc.,* 681 A.2d 249, 254 (R.I.1996). In such circumstances, we apply the appellate rule and examine the record to determine whether there is any competent evidence that could support the jury's verdict. *Hefner v. Distel,* 813 A.2d 66, 70 (R.I.2003). As described above, defendants introduced sufficient evidence to support the jury's conclusion that the home's actions vis-à-vis Jalowy were not retaliatory, and thus we affirm the court's denial of Jalowy's new-trial motion on the retaliation claim.

### Intentional and Negligent Infliction of Emotional Distress

■ In deciding that defendants were entitled to judgment notwithstanding the verdict with respect to Jalowy's claims for intentional infliction of emotional distress, the trial justice ruled that:

"In reviewing the evidence in the light most favorable to [plaintiff] and in providing him with the benefit of all reasonable and legitimate inferences, this Court determines that the jury's finding * * * fails to respond truly to the merits of the controversy and *is against the fair preponderance of the evidence.* This Court finds that *based upon the evidence offered by both sides at trial,* the conduct of defendants was not 'so outrageous in character and so extreme in degree' to warrant a finding for intentional infliction of emotional distress. Here, defendants' practice of monitoring and limiting Jalowy's visits may have been inconvenient and offensive to him, [but] it is 'a far stretch * * * to characterize it as so extreme and outrageous as to be atrocious and utterly intolerable in a civilized community.' *Swerdlick v. Koch,* 721 A.2d 849, 863 (R.I.1998)." (Emphases added.)

In granting defendants' motion for judgment as a matter of law, the trial justice erred by effectively treating it as a new-trial motion and concluding that Jalowy's case was "against the fair preponderance of the evidence." He also erred when he characterized defendants' banishment of Jalowy from the premises as merely "defendants' practice of * * * limiting Jalowy's visits." The banishment here amounted to much more than just "limiting Jalowy's visits."

■ When ruling on a motion for judgment as a matter of law after the close of the evidence, the trial justice "should consider the evidence presented at trial in the light most favorable to the nonmoving party, *without weighing the evidence* or evaluating the credibility of witnesses, and should draw all reasonable inferences from the evidence to support the position of the nonmoving party." *Swerdlick v. Koch,* 721 A.2d 849, 856 (R.I.1998). (Emphasis added.) On review, this Court applies the same standard. *Id.* Although we hold that the trial justice erred when he balanced the evidence as he did and mischaracterized Jalowy's banishment as merely "limiting Jalowy's visits," we ultimately agree with his conclusion to grant defendants'

motion upon applying the standard he should have employed.

■ To prevail on a claim for intentional infliction of emotional distress, a plaintiff must show "extreme and outrageous conduct on the part of the defendant." *Di-Battista v. State*, 808 A.2d 1081, 1088 (R.I. 2002). In deciding whether the evidence introduced at trial can support a jury finding of extreme and outrageous conduct, this Court has adopted the very high standard set forth in the Restatement (Second) *Torts* § 46 (1965) with regard to what evidence is required to satisfy this element of the claim:

"It has not been enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by 'malice,' or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort. *Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.* Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, 'Outrageous!'" *Swerdlick*, 721 A.2d at 863 (quoting Restatement (Second) *Torts*, § 46 cmt. *d* at 73).

■ Whether conduct "may reasonably be regarded as so extreme and outrageous as to permit recovery" for intentional infliction of emotional distress is a matter of law to be decided by a court, and if the court answers that question in the negative, it should grant judgment as a matter of law and dismiss such a claim. *See* Restatement (Second) *Torts*, § 46

cmt. *h.* In deciding this question of law, however, a court may need to rely on the jury to determine whether the party bearing the burden of proof has proven the existence of certain duty-triggering facts. *See Kuzniar v. Keach*, 709 A.2d 1050, 1055–56 (R.I.1998). Thus, in this case, a finding by the jury that defendants had retaliated against Jalowy for complaining to the regulatory authorities about the nurses at the home may well have sufficed to warrant the jury's returning a verdict for Jalowy on the intentional-infliction claim. Further, when considering a judgment as a matter of law after a jury has returned a verdict and resolved certain factual issues, a court has a duty to reconcile, if possible, a jury's interrogatory responses on any reasonable theory consistent with the evidence. *Pierce v. Southern Pacific Transportation Co.*, 823 F.2d 1366, 1370 (9th Cir.1987). In this instance, because the jury concluded that the home did not retaliate against Jalowy for complaining about the nurses, the trial justice's job in passing on the various post-verdict motions was to determine whether the evidence entitled the jury to find that defendants' actions were nonretaliatory under the act and, if so, whether such actions nonetheless were so extreme and outrageous as to permit a verdict in favor of Jalowy to stand on the intentional-infliction claim.

The most compelling evidence Jalowy introduced to satisfy the outrageous-conduct element of his intentional-infliction claim was Rotella's decision on January 1, 1993, to bar Jalowy from visiting with his mother at the home. As Jalowy testified at trial, when he met with Rotella on January 1, he did not even let Jalowy finish explaining what had happened during his most unpleasant New Year's Eve encounter with the home's nurses when Rotella peremptorily informed him of his immedi-

ate ouster from the home. Thus, Rotella told him, "As of 3:20 today you are officially barred from this facility and the grounds." After this decree of banishment, Jalowy did not see his mother again at the home for approximately six weeks. He was allowed back into the home only when he obtained a temporary restraining order from the Superior Court after he filed this lawsuit.. The order, effective February 4, 1993, established a visitation schedule allowing Jalowy to meet with his mother one hour a night for three nights a week in the home's lobby.

The key question for this Court on appeal is whether defendants' nonretaliatory banishment of Jalowy from the home—thereby preventing him from visiting there with his mother for an approximate six-week period in 1993—together with defendants' antecedent and subsequent monitoring conduct, including allegedly ordering the nursing staff to closely follow Jalowy when he was on the premises—were acts that, as a matter of law, a jury could find "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." Swerdlick, 721 A.2d at 863 (quoting Restatement (Second) Torts § 46 cmt. d at 73). In DiBattista, we acknowledged that the defendants' "swift action"—pursuant to which the Department of Children, Youth and Families revoked the plaintiffs' license to serve as foster-care parents one day after the agency informed the parents it was considering such a decision, and then summarily removed the children involved from their custody—was conduct that "doubtlessly caused * * * emotional distress." DiBattista, 808 A.2d at 1088. Nonetheless, we held that the plaintiffs' claim failed as a matter of law because they did not allege any facts indicating extreme and outra-

geous conduct under the circumstances presented by that case. Id.

■ Likewise, under the circumstances of this case, defendants' withdrawal of their consent for Jalowy to visit with his mother at the nursing home and their other alleged misdeeds—including close monitoring of him while he was on the premises—were no doubt stress-inducing. Perhaps, when viewed most favorably to Jalowy, they even could be characterized as a most unnecessary and heavy-handed overreaction on defendants' part to Jalowy's sometimes fractious forays into the alien world of this nursing-home's administration. Yet, whether viewed in isolation or in the aggregate, defendants' nonretaliatory actions were not so extreme and atrocious a response to Jalowy's perceived intemperate behavior that a reasonable jury could find them to be " 'utterly intolerable in a civilized community.' " Swerdlick, 721 A.2d at 863.

Significantly, Jalowy did not allege or prove that the home breached any contractual commitment by the actions it took against him. And despite the fact that the nursing-home business is heavily regulated by state and federal authorities, Jalowy did not direct the home, the Superior Court, or this Court to any statute or regulation that prevented defendants from excluding him from the home. Nor has he pointed us to any other official policy that outlaws such no-visitation orders in these circumstances. Indeed, nursing homes and assisted-living facilities may have legitimate reasons for restricting or preventing would-be visitors from obtaining unfettered access to residents. This is especially true under circumstances in which the home perceives that the visitor has been abusive to its staff, and continued visits might cause the environment at the home to deteriorate into one that was

more disruptive or unsafe for the residents and the staff.

■ Legislatures in Rhode Island and other states, as well as the United States Congress, have addressed the question of how best to balance the legitimate concerns of nursing-home owners and operators in protecting their residents' and staff members' health and safety with the interest of residents and their visitors in obtaining reasonable if not unrestricted access to each other on the premises of these facilities. Thus, both state and federal authorities have passed laws and regulations that define a resident's rights to obtain access to certain visitors on the premises of those facilities that are subject to federal and state regulation. *See, e.g.,* 42 C.F.R. § 483.10(j)(1) (2003); G.L.1956 § 23–17.4–16; Ohio Rev.Code Ann. § 3721.13(A)(21) (2002); Wash. Rev.Code § 70.129.09(1)(f) (1994). And even though these laws differ in the balances they strike between the right of the residents to have unrestricted access to visitors and the right of the nursing home to restrict or prevent such access, none of them expressly confer enforceable rights on visitors to obtain unrestricted access to relatives or to other residents of such facilities. Thus, in Rhode Island, residents in assisted-living homes enjoy a conditional statutory right to "[h]ave visitors of their choice without restrictions so long as those visitors do not pose a health or safety risk to other residents, staff, or visitors, or a risk to property, and comply with reasonable hours and security procedures." Section 23–17.4–16(a)(2)(viii).

Federal regulations grant residents in facilities that are subject to these strictures an even broader right to have relatives visit with them. Thus, 42 C.F.R. § 483.10(j)(1)(vii), provides that a "resident has the right and the facility must provide immediate access to any resident by * * *

immediate family or other relatives"—subject "to the resident's right to deny or withdraw consent at any time." A resident's right to have access to unrelated visitors is further "[s]ubject to reasonable restrictions." 42 C.F.R. § 483.10(j)(1)(viii).

But none of these laws, rules, and regulations expressly confer rights of access upon visitors—only upon the residents themselves. Much less do they expressly endow visitors with the right to maintain a civil lawsuit for damages or for equitable relief if they can establish one or more violations of these provisions.

Viewed in the light most favorable to Jalowy, but taking into account the jury's finding that defendants' actions were not retaliatory, defendants' decision to institute a total ban on his visits with his mother at the home was a drastic overreaction to his attempts to identify and remediate what he perceived to be lackadaisical and uncaring practices on the part of certain members of the home's nursing staff. Arguably, such a ban even may have been illegal vis-à-vis Jalowy's mother (if she or her legal guardian had complained about it to the appropriate authorities, which, apparently, they did not). Nevertheless, we cannot say that, under the circumstances, defendants' nonretaliatory decision to banish Jalowy from the home could be described as conduct that was *"beyond all possible bounds of decency, [so as] to be regarded as atrocious, and utterly intolerable in a civilized community."* *Swerdlick,* 721 A.2d at 863 (quoting Restatement (Second) *Torts,* § 46 cmt. *d,* at 73).

We have held that a party may not be liable for intentional infliction of emotional distress "when [a defendant] has done no more than insist on [its] legal rights in a permissible way, even though such insistence is likely or even certain to annoy, disturb, or inconvenience [plaintiff] or even

cause [plaintiff] to suffer some emotional distress." *Swerdlick,* 721 A.2d at 863 (quoting *Champlin v. Washington Trust Co. of Westerly,* 478 A.2d 985, 989 (R.I. 1984)). Thus, absent a contractual provision or some law, rule, or regulation preventing the home from banning visitors such as Jalowy from obtaining access to the home for visits with relatives who are residents there—and providing such visitors with standing to raise such claims—we are not persuaded that the home acted outrageously, atrociously, and beyond all possible bounds of decency when it barred Jalowy from entering onto its premises. After all, as an owner of real estate, one of the fundamental rights that the home possessed was the right to exclude unwanted interlopers from its premises. *Nollan v. California Coastal Commission,* 483 U.S. 825, 831, 107 S.Ct. 3141, 3145, 97 L.Ed.2d 677, 686 (1987). Moreover, the home did nothing to prevent Jalowy from visiting with his mother off the premises, much less did it try to prevent or dissuade her from leaving the home to meet with Jalowy or from relocating to another facility if she had wished to do so. And certainly defendants' later actions in defending against Jalowy's suit for injunctive relief and damages—which even Jalowy did not allege exceeded their legal rights—did not constitute the type of behavior capable of giving rise to a claim for intentional infliction of emotional distress.

In summary, then, although the trial justice erred in balancing the evidence adduced by defendants against the evidence introduced by Jalowy in ruling on defendants' motion for judgment as a matter of law, we agree with his ultimate conclusion that defendants in this case were entitled to judgment as a matter of law with respect to plaintiff's claim of intentional infliction of emotional distress.

Finally, Jalowy argues that the trial justice erred in denying his motion for an additur or a new trial on his claim for negligent infliction of emotional distress. We reject this argument because defendants were entitled to judgment as a matter of law on the negligent-infliction claim. Only two classes of persons may bring claims for negligent infliction of emotional distress: those within the "zone-of-danger" who are physically endangered by the acts of a negligent defendant, and bystanders related to a victim whom they witness being injured. *Marchetti v. Parsons,* 638 A.2d 1047, 1049, 1051 (R.I.1994). Here, the tortious behavior Jalowy cited in his complaint and at trial involved alleged misconduct directed at him: namely, defendants' decision to monitor him when he was on the premises and, ultimately, to bar him from visiting his mother at the home. Because Jalowy was not physically endangered by defendants' alleged negligence; because he did not otherwise fall within either of the above-specified classes of persons who can bring claims for negligent-infliction of emotional distress; and because he alleged that his stress in this case resulted from defendants' deliberate, retaliatory acts directed against him rather than at a relative, he failed to adduce evidence supporting a claim for negligent infliction of emotional distress. *Liu v. Striuli,* 36 F.Supp.2d 452, 480 (D.R.I. 1999); *Iacampo v. Hasbro, Inc.,* 929 F.Supp. 562, 581 (D.R.I.1996).

Because we hold that the defendants were entitled to judgment as a matter of law on both emotional-distress claims, we need not address plaintiff's arguments (1) that he was entitled to an additur or a new trial on his emotional-distress claims; (2) that the trial justice erred in refusing to let him testify about his alleged economic damages; and (3) that the trial justice erred when he allowed his attorney only forty minutes for closing arguments, even

though the applicable rule allowed sixty minutes for such arguments. Nor need we consider the defendants' contention that because Jalowy failed to introduce appropriate physical-symptoms evidence to buttress his emotional-distress claims, he failed to prove them as required by law. *See, e.g., Vallinoto v. DiSandro,* 688 A.2d 830, 838–40 (R.I.1997) (describing the physical symptom requirement).

## Conclusion

For these reasons, we deny the appeal and affirm the judgment of the Superior Court to which we return the papers in this case.