DECISION
This matter came on for trial before the Court in October 2008. Chen Ying Min claims that her neighbors entered her property and cut down a large tree. She seeks damages, a declaratory judgment to clarify the boundary, and injunctive relief to prevent future encroachments. After trial, this Court finds in her favor as detailed below.
 Findings of Fact
The Court makes the following findings of fact.
The boundary dispute
Chen Ying Min is the owner of property located at 21 Wilson Avenue in Warwick, Rhode Island. The property, in the Oakland Beach section, was previously owned by her late husband. The couple constructed a home and Chen Ying Min has resided on the property since June 2002. In the rear of the yard was a large, native, red maple tree. Chen Ying Min and her late husband had a stockade fence erected on what *Page 2 
they believed was the rear of their property.[1] Two ends of the fence were nailed to the tree, and about 80%[2] of the tree was on Chen Ying Min's side of the fence.
Mr. and Ms. Pariseau owned property at 18 Kenway Avenue in Warwick at least since 2003.[3] The back yards of each of the two properties share a common border for approximately 40 feet. In 2003, Ms. Pariseau enlisted a contractor to construct a home on her lot. Ms. Pariseau intended to clear her lot of all trees in order to build her house and develop her property. She relied on a survey performed by Armand Desvoyaux, dated July 8, 2003 (Exhibit 2). The survey shows that the fence, constructed by Chen Ying Min, to be almost entirely on Ms. Pariseau's property. The fence is shown as two unparallel segments which meet in the center near where the tree was. It is not clear from the survey which property the tree was on, as that section of the fence angles toward Chen Ying Min's property.
At the end of July, 2003, Chen Ying Min received a note at her door indicating that the tree "is coming down" and the fence must be removed. (Exhibit 9) She then received a visit from Ms. Pariseau's father. Within two hours, Chen Ying Min went to Ms. Pariseau's nearby store in an attempt to speak with her. During this July 21, 2003 meeting, Chen Ying Min was cooperative, unsure of who had made the mistake. Ms. Pariseau asserted that she obtained a survey, but did not have it with her. Chen Ying Min asked Ms. Pariseau not to take any further action until she obtained a survey. Ms. *Page 3 
Pariseau would not reveal when the tree would be cut. Ms. Pariseau indicated the survey would be available Saturday and left Chen Ying Min her cell phone number.
Concerned about being left without any assurances, Chen Ying Min contacted a family friend, Peter Albertson. Together, they returned to Ms. Pariseau's store. Mr. Albertson asked for time to research the issue and Ms. Pariseau flatly refused.[4] Again, Ms. Pariseau did not reveal when the tree would be cut. Ms. Pariseau was abrupt and hostile.
Leaving the store, Chen Ying Min was still nervous and upset. Mr. Albertson and Chen Ying Min then went to city hall to attempt to research the location of the boundary. They returned to Chen Ying Min's home and attempted to measure the yard. They then traveled to Mr. Pariseau's home. Chen Ying Min explained her desire to wait to verify and Mr. Pariseau would not agree or assist her. Mr. Pariseau confirmed that Ms. Pariseau was assertive and unlikely to retract from her position.
Again, Mr. Albertson and Chen Ying Min returned to Ms. Pariseau's store. This time, Ms. Pariseau refused to wait for Chen Ying Min to do a survey, refused to delay in cutting the tree, and threatened to strike them with one of the maps they brought along.
By then, Mr. and Ms. Pariseau knew there were questions concerning the location of the boundary line and the tree. Nevertheless, Ms. Pariseau left on vacation, knowing that Chen Ying Min would not be able to access her survey or contact her. Within two days the tree was cut and the fence was removed. Ms. Pariseau also removed other trees on her property. Now, there was nothing left in Chen Ying Min's backyard but for an *Page 4 
open field of grass, and dismantled fence stacked in the yard. Chen Ying Min described the distress she felt and her inability to focus or sleep.
Shortly thereafter, John Greene was retained by Chen Ying Min to survey her yard. Mr. Greene had been a surveyor for over 40 years with extensive knowledge of Oakland Beach. He estimated that he had completed 100 surveys in the Oakland Beach area, including several on the block in question. As Chen Ying Min was "frantic" he went to the site quickly. He then traveled to the Warwick Engineering Department, where he located Mr. Desvoyaux's survey of July 8, 2003. As soon as Mr. Greene completed his own survey, (Exhibit 4) he telephoned Mr. Desvoyaux to note the difference of 2.79 feet. At the end of August, 2003, the two surveyors met at the property. By September 23, 2003, Mr. Desvoyaux modified his survey providing Chen Ying Min with an additional three feet of property. (Exhibit 3).
Shortly after the tree had been cut, the fence was put back up by Ms. Pariseau's workers, but it was now moved about three feet to the north. In other words, Chen Ying Min's backyard had been expanded by three more feet in depth.
Most of the tree was on Chen Ying Min's property. She did not consent to it being cut, or to the workers being on her property. She did not consent to removal or relocation of the fence. The northernmost boundary of Chen Ying Min's property is the line which is reflected as her border as shown on Mr. Greene's survey of August 18, 2003 (exhibit 4). Therefore the entire stockade fence, as it was set before July 2003, was on Chen Ying Min's property. There is no gap between Chen Ying Min's property and Ms. Pariseau's property; rather, they bound on one another. *Page 5 
 The survey methods
The various methods in which the surveyors performed their work are worthy of discussion. The Court therefore makes the following additional findings of fact:
Mr. John Greene performed the survey for Chen Ying Min. He began with his extensive familiarity of the Oakland Beach plats and experience in surveying in the area. To perform the survey, he began with the line of Wilson Road at the front of her property. He measured that it was consistent with a line which extends from markers found on the westerly side of Pequot Drive and the easterly side of Oaklawn Beach Road (each of these are north of Kenway Avenue). He knows these are consistent with a marker to the north and west on Oakland Beach Road, and a marker to the northeast of the Barn Lot.[5]
These markers are shown on a plat of the Oakland Beach Avenue dated 1884 and recorded in January 1885 (Exhibit 25). This plat shows two survey markers on Oakland Beach Road, the survey marker at the Barn Lot and two other surveys further south on Pequot Road. Mr. Greene relies on the Barn Lot marker, the survey marker on the east side of Oakland Beach Road (then Mohegan Road) closest to the Chen Ying Min property and the survey marker on the east side of Pequot Road, closest to the Chen Ying Min property. Two of the markers[6] bound the line which is the boundary line between Chen Ying Min's property and the Pariseau property. The three markers are also shown on the Beach Park Plat of 1909 (Exhibit 27), which subdivides the property on Kenway Avenue into separate lots. The deeds to Ms. Pariseau specifically refer to this plat: Ms. *Page 6 
Pariseau's deed (Exhibit 28) does not provide a metes and bounds description, only a description of the lots on the Beach Park plat. Clearly, therefore, the southern boundary of Ms. Pariseau's property is the line between two of the granite markers. Chen Ying Min's lot is consistent with this line, with the line of Wilson Avenue and with the other lots on her end of the street and on her block.
Mr. Armand J. Desvoyaux performed the initial survey for Ms. Pariseau (Joint Exhibit 1B). The report does not explain his methodology for surveying. Mr. Desvoyaux's testimony implies that he measured the bound at the Barn Lot and found it to be 3.74 feet off of where it was presumed to have been set in the 1870s. He described how markers on Ottawa Avenue and another marker on the beach to the west (over 2000 feet away) do not line up. He then attempted to justify the markers he relied on. Finding that a "gap" then existed between the two lots involved at this trial, he concluded that the gap belong to the owners of the plat in the 1890s. He claimed he balanced "all the locations of all the bounds." Finding that the Barn Lot marker also failed to measure properly with the markers he used, he then concludes that all markers which line up with the Barn Lot marker (though in the immediate area and in the original surveys of the lots) should be disregarded. He relies solely on markers a substantial distance away, which he knew to be out of alignment with Wilson Street and Ms. Pariseau's property.[7] At the trial in 2008, Mr. Desvoyaux concluded that his original survey (of July 2003) was correct, and the modified survey was incorrect, though he produced no new corrected survey.
Mr. Nabil Rashid was another surveyor retained by Ms. Pariseau. He testified that his "intention wasn't to survey the property. The intention was to discover the gap." *Page 7 
He was attempting to "verify" if "there is a gap between the two properties." He used only two markers to perform his analysis.[8] He used those to devise the boundary lines for Chen Ying Min's lot. He verified the property lines created only by relying on concrete markers which he found on Wilson Street, but not shown on any recorded plat.
An opinion letter by Sheldon Survey, Inc. was admitted as a full exhibit but never referenced during the trial. (Joint Exhibit 1D). The unattested document indicates it is a "preliminary review" and Ms. Pariseau "requested this surveyor to verify location of survey points placed by Mr. Armond Desvoyaux. . . ." There is no resultant map for the Sheldon work, and the letter contains quotes without references. Again, the surveyor seems to use only two markers. The surveyor then addresses the issue of the gap "for the review of the owner." In sum, the Sheldon Survey is unpersuasive as it was not discussed or attested to. The Court gives this document no weight.
In determining the boundaries of the respective properties the Court should consider the bounds as described in the deeds. Ms. Pariseau's deed refers to the Beach Park Plat of 1909 to define all of her property. "A monument governs measurements and the land of an adjoining proprietor is a monument within this rule." DiMaio v. Ranaldi,49 R.I. 204 (1928). Hence there is little support, legally or factually, that a "gap" existed, or that Ms. Pariseau owned the entirety of the tree. *Page 8 
 Discussion of Witnesses
A review of the testimony and other evidence is helpful in explaining the Court's factual findings and determinations of credibility.
Mr. John Greene was a surveyor with over 40 years of experience in surveying properties in Warwick, including about 100 in the Oakland Beach section. With his extensive experience, he was able to clearly distinguish between different survey methods, the various plats commonly used, and the consistency of the markers used. He labeled the 1879 barn lot marker as "the key to Oakland Beach." He used several different markers to verify the markers he used for his survey. The markers he used were from at least three plat cards and were all to the east of Oakland Beach Avenue. As the Goff and Randall shows this plat, but not with distances or any reference to markers, he referenced it and distinguished why he did not rely upon it. He used multiple bounds to verify his results, and they were all consistent with one another. The bounds he did not use are inconsistent with all bounds east of Oakland Beach Avenue and South of Ottawa Avenue. He explained the errors of the bounds, knowing their reliability from having depended on them for many years. He described the surveying of the area, historically, beginning with the oldest deed.
Mr. Greene noted and explained that Wilson Street does not line up, and the importance of neighborhood consistency. He considered it his duty to rely on known boundary lines, and not those he knows to be in error. He knew that property lines on the other side of Oakland Beach Avenue did not match. He found Chen Ying Min's property, using the Beach Park plat line as a northern bound, to fall perfectly on the border of Wilson Ave. *Page 9 
The Court found Mr. Greene to be logical, clear, consistent and highly credible. His survey and his testimony were clearly important to him, even to the point of disagreeing with his colleagues, though it was something he was not pleased to do. Surveying is an important profession to Mr. Greene and he was concerned about the integrity of the property lines and the effects on future boundary disputes in the area.
Mr. Desvoyaux was far less credible, and had a different approach to surveying. His report says it contains "the methods used to perform the survey . . .," but it does not (exhibit 1B, unnumbered page 2). Under "conclusions" it simply attaches maps and sketches. The same report states "The purpose of this report is to provide evidence why two abutting properties, that should share a common property line, do not, and in this particular case, are more than three feet apart." (Unnumbered page 3, Introduction.) Hence the primary purpose of the report was to justify the gap, not to question the gap's existence or locate the boundaries of the two properties.
He relied heavily on concrete markers on Wilson Avenue. The markers are unexplained in any deeds or plat. Mr. Desvoyaux corrected his report to move the Pariseau property line. One of his surveys lists a fence "to be set" which is not there and was never there. He could not explain why he started with bounds so far from the property after Mr. Greene testified that in surveying "error is a function of distance."
Mr. Devoyaux concluded that a gap existed, though he never prepared a new map showing a gap. Indeed he never illustrated the location of the Chen Ying Min northern boundary, obviously an issue at trial. He acknowledged that all plat cards show no gaps but the subject properties abut along the map line. *Page 10 
He also concluded that the tree with the fence nailed to it was an obvious question for him when he surveyed in June 2003, but he claims he never went to the backyard (though he references several fences). He admits never viewing the fence.
Mr. Devoyaux gave confusing, avoiding, indirect answers to questions on cross and questions by the Court. The Court gave his testimony low weight.
Ms. Pariseau is a defendant. The Court also found her testimony to be of minimal credibility. Her testimony contradicted that of Chen Ying Min and the others who dealt with her prior to the cutting of the tree. She also contradicted herself, changing her version of the events slightly. Ms. Pariseau testified that she informed Chen Ying Min and the men with her that the survey may be available Saturday, and acknowledges that she departed for the beach and had the tree cut down during her absence.
Mr. Rahsed was another surveyor called by plaintiff. He did not verify his survey results, but based all of his results on two starting points. He used markers which he knew to be in dispute. He referred to plat cards on his `survey' but did not reference them in his testimony, as they are inconsistent with his conclusion. Mr. Rahsed's express goal was to find the gap. He obviously surveyed for this litigation, and completed his work in 2006. He did not refer to his work as a survey. He refused to indicate why he relied on artificial monuments which had never been platted (the concrete markers). The Court found his testimony to be of low credibility.
Chen Ying Min appeared highly credible, clearly concerned and prepared for her testimony. She became emotional on cross-examination, but remained consistent. Clearly, this matter was important to her and she was upset by Ms. Pariseau's mistreatment. She had a vivid, uncontradicted recollection of the written note, the *Page 11 
different meetings with Mr. and Ms. Pariseau, Ms. Pariseau's refusal to cooperate, the search at city hall, her efforts to find Ms. Pariseau's survey, and how she learned the tree had been cut. Chen Ying Min's timing and dates were somewhat out of sequence with that of others, but not on any significant issue. Apart from that, her testimony was consistent with other witnesses. There was no reason to disbelieve Chen Ying Min.
Peter Albertson was also highly credible, though his recollection was not complete for all times and dates. He vividly recalled the search at city hall, meetings with the Pariseaus and measuring the yard. He was straightforward and frank even when the questions became unnecessarily bitter and challenging.
Mr. Schwartz was an arborist who viewed the site after the tree was cut. He knew little about the boundary issue but gave the location of the tree (from the remaining root structure), concluding that it was on Chen Ying Min's property. As he never looked at the Pariseau site, his testimony added little to the issue of liability.
Mr. Frigon built Chen Ying Min's house. He did not have a vivid recollection, was clearly displeased to be there, but attempted to be cooperative. He seemed to get his directions confused but recalled nailing the fence to a tree following a plat plan.
 ANALYSIS AND CONCLUSIONS OF LAW
A. Trespass
Count one of the complaint sounds in trespass. Chen Ying Min contends that Mr. and Ms. Pariseau trespassed in cutting the tree, removing the fence, and apparently resetting the fence to a new location. The Rhode Island Supreme Court has defined a trespasser as *Page 12 
 "`One who intentionally and without consent or privilege enters another's property.'" Ferreira v. Strack, 652 A.2d 965, 969 (R.I. 1995) (quoting Black's Law Dictionary 1504 (6th ed. 1990)).
To recover for trespass, a party must show (1) the adverse party intentionally entered onto the owner's property; and (2) plaintiff had rightful possession of such property. State v. Verrecchia, 766 A.2d 377
(R.I. 2001); Berberian v. Avery, 99 R.I. 77, 205 A.2d 579 (1964). One who has consent or privilege and enters onto another's property is not a trespasser. Ferreira v. Strack, 652 A.2d 965, 969 (R.I. 1995).
At the time of these acts, Ms. Pariseau had a survey which she refused to show to Chen Ying Min. She claimed it verified her ownership of the disputed areas. Nevertheless, it is clear that Chen Ying Min disputed the Parisaeu's ownership of the tree and offered to do a new survey. Chen Ying Min clearly claimed a different, established boundary line, outlined by the fence. She pled for Mr. and Ms. Pariseau to preserve the tree. Mr. and Ms. Pariseau knew the risk, had the ability to stop the destruction and refused.
Chen Ying Min's original boundary line, outlined by her original fence, was correct. Ms. Pariseau apparently relied on the Desvoyaux survey of July 2003, was incorrect. Ms. Pariseau intentionally and without consent entered onto Chen Ying Min's property and committed a trespass.
While an action for trespass is not contingent upon actual damage or actual injury, Mesolella v. City of Providence, 508 A.2d 651, 668 (R.I. 1986) here, Chen Ying Min suffered significant damage from the injury, the loss of her tree, the removal of her fence and, in a separate trespass, the resetting of her fence in a new location — all without her consent. *Page 13 
Therefore, while no damages are yet awarded, a preliminary injunction preventing further trespasses is appropriate. An injunction shall issue preventing Ms. Pariseau from entering onto Chen Ying Min's property, as set forth below.
B. Cutting of the Tree.
Chen Ying Min seeks double damages for the cutting of the tree, pursuant to specific statute:
 R.I.G.L. § 34-20-1. Liability for unauthorized cutting of trees or wood — Every person who shall cut, destroy, or carry away any tree, timber, wood or under wood whatsoever, lying or growing on the land of any other person, without leave of the owner thereof, shall, for every such trespass, pay the party injured twice the value of any tree so cut, destroyed, or carried away; and for the wood or under wood, thrice the value thereof; to be recovered by civil action.
Chen Ying Min established that Ms. Pariseau cut the tree, without consent.
C. Negligence.
As Chen Ying Min asserts an action of negligence, she must establish a breach of a duty. Montouri v. Narragansett Electric Co., 418 A.2d 5
(1980). As indicated, Chen Ying Min established that Mr. and Ms. Pariseau knew of a claim of ownership in the fence and tree. Accordingly, the Court finds that the Pariseaus owed Chen Ying Min a duty of care and that duty was breached. The breach of the duty proximately resulted in the destruction of some of Chen Ying Min's property. But for Mr. and Ms. Pariseau's actions, the tree would not have been harmed and the fence would not have been moved. Hence, Mr. and Ms. Pariseau are also liable under the negligence count. Id. *Page 14 
D. Intentional infliction of emotional distress.
Chen Ying Min next alleges that the Pariseaus intentionally inflicted emotional distress upon her. A review of the recent case law establishes:
 To prevail on a claim for intentional infliction of emotional distress, a plaintiff must show `extreme and outrageous conduct on the part of the defendant.' Jalowy v. Friendly Home, Inc., 818 A.2d 698, 707 (R.I. 2003) (quoting DiBattista v. State, 808 A.2d 1081, 1088
(R.I. 2002)). "[A] plaintiff must [also] prove physical symptomatology resulting from the alleged improper conduct." Vallinoto v. DiSandro, 688 A.2d 830, 838 (R.I. 1997) (citing Reilly v. United States, 547 A.2d 894, 898 (R.I. 1988)). With respect to the necessary conduct required to be proven, we have adopted the very high standard set forth in the Restatement (Second) Torts § 46 (1965):
 It has not been enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by `malice,' or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort. Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, `Outrageous!' Jalowy, 818 A.2d at 707 (quoting Swerdlick v. Koch, 721 A.2d 849, 863 (R.I. 1998) and Restatement (Second) Torts, § 46 cmt. d at 73).
 Hoffman v. Davenport-Metcalf, 851 A.2d 1083, 1089-1090 (R.I. 2004).
In this action, Chen Ying Min limited her physical ailments to loss of sleep and nervousness. In Grieco ex rel. Doe v. Napolitano,813 A.2d 994, 998 (R.I. 2003) the high court found sleeping and eating disorders to be sufficient physical manifestation for even the negligent infliction of emotional distress, declaring that "physical manifestations or *Page 15 
symptomatoplogy does not mean physical injury."[9] Given the egregious nature of Ms. Pariseau's actions, and the obvious impact upon Chen Ying Min, this Court does not require medical records to substantiate the liability of Ms. Pariseau for this tort. As there is uncontroverted evidence that Chen Ying Min lost sleep and incurred stress as a result of this intentional action of Ms. Pariseau, plaintiff established that defendant is liable for the intentional infliction of emotional distress.
E. Negligent infliction of emotional distress.
To date, the Rhode Island Supreme Court has recognized the tort of negligent infliction only in limited circumstances:
 Only two groups of plaintiffs are able, however, to seek recovery under a theory of negligent infliction of emotional distress: "those within the `zone-of-danger' who are physically endangered by the acts of a negligent defendant, and bystanders related to a victim whom they witness being injured." Jalowy v. Friendly Home, Inc., 818 A.2d 698, 710 (R.I. 2003) (citing Marchetti v. Parsons, 638 A.2d 1047, 1049, 1051
(R.I. 1994)). Perrotti v. Gonicberg, 877 A.2d 631, 636 (R.I. 2005)
Chen Ying Min failed to demonstrate that she was in a zone of danger. She was not on the property when the cutting of the tree or the removal of the fence occurred. *Page 16 
With this backdrop and because an intentional infliction occurred, application of the tort of negligent infliction of emotional distress is inappropriate. Judgment shall enter for the defendant on this count.
F. Encroachment
In Count 6, Chen Ying Min alleges that the Pariseaus constructed a fence on her property. While she has demonstrated the boundaries of her property, and another fence does appear to enter onto or near the northwest corner of the property, she has not demonstrated that this fence was placed on her property (as indicated in the complaint) by Mr. or Mrs. Pariseau. Judgment shall enter for the defendants on count 6 of the complaint.
G. Exemplary damages.
Chen Ying Min also seeks exemplary damages. "[T]he party seeking punitive damages has the burden of producing evidence of such willfulness, recklessness or wickedness on the part of the party of fault, as amounts to criminality, for which the good of society and warning to the individual, ought to be punished." Palmisano v.Toth, 624 A.2d 314, 317 (R.I. 1993). Citations deleted.
The evidence demonstrates that Mr. and Ms. Pariseau knew the risk — they recognized that Chen Ying Min contended the tree was on her property and sought to protect the tree. They allowed the harm to go forward. Such acts were at best patently reckless. They allowed their agents to go forward with what may amount to a criminal trespass (see *Page 17 
R.I.G.L. § 11-44-26.) Exemplary damages may be appropriate here. The issue is preserved for the hearing on damages.
The Court finds that she was acting with the requisite willfulness, recklessness or wickedness and hence punitive damages may be appropriate and are preserved for later hearing. The Court is not convinced that Mr. Pariseau's acts met the higher threshold necessary for a punitive damage award, though it notes that he was at least partially reckless. The Court will therefore reserve the issue of exemplary damages for Mr. Pariseau for later hearing.
H. Counterclaims
Defendants' counterclaim count I requests the Court to quiet title. Count III seeks a declaratory judgment defining the border between the properties. Much of this has been accomplished above. Again, the northernmost boundary of Chen Ying Min's property is the line which is reflected as her border as shown on Mr. Greene's survey of August 18, 2003 (exhibit 4). There is no gap between Chen Ying Min's property and Ms. Pariseau's property; rather, they bound on one another. A declaratory judgment may issue to this extent, but there is no need to quiet Ms. Pariseau's title, which has never been threatened.
Counterclaim count II sounds in slander of title. Ms. Pariseau has not demonstrated that Chen Ying Min misrepresented her boundary line, relied on an incorrect survey or defamed a survey (of Ms. Pariseau) which was correct. Accordingly, judgment shall enter for Chen Ying Min on counterclaim count II.
Counterclaim count IV alleges that Chen Ying Min encroached on the property of Ms. Pariseau. There was no evidence to establish that Chen Ying Min encroached. Judgment shall enter for Chen Ying Min on counterclaim count IV. *Page 18 
Counterclaim counts V and VI sound in intentional infliction of emotional distress and negligent infliction of emotional distress. Chen Ying Min did not wrongfully inflict emotional distress, nor does the Court find that Ms. Pariseau suffered any distress caused by Chen Ying Min. Had Ms. Pariseau employed a cooperative approach toward resolving the problem with her neighbor early on, she may have resolved this problem. Instead, Ms. Pariseau inflicted harm upon herself by avoiding Chen Ying Min's requests to wait, and Ms. Pariseau cutting the tree while she left town. Judgment shall enter for Chen Ying Min on counterclaim counts V and VI.
 CONCLUSION
Judgment shall enter for Chen Ying Min on liability on counts 1, 2, 3, and 4 of the complaint and counts 1, 2, 4, 5, and 6 of the counterclaim.[10] Judgment shall enter for Ms. Pariseau on Counts 5 and 6 of the complaint. Judgment is awarded to Ms. Pariseau on Count 3 of her counterclaim, but only to the extent that this Court shall declare the precise borders of the properties, as already set forth herein. Damages are preserved for a later hearing.
[1] While the stockade fence was completed without a survey, Chen Ying Min claims that it was posted toward the plaintiff's side of other fences that were already along this line.
[2] The Court does not make a specific finding concerning the percentage of the tree on each lot as the issue of damages has been severed for a separate hearing.
[3] Ms. Pariseau testified that she separated from Mr. Pariseau in 2003, and divorced in 2005. She recorded several deeds to herself in 2003. She referred to herself as "Terry Leal." As her name was never changed on the pleadings, and apparently never changed on the deeds, the Court will continue to refer to her as Ms. Pariseau.
[4] Mr. Albertson quotes Ms. Pariseau as saying "You should know where your line is; I know where mine is."
[5] He uses these markers as they are consistent with a survey marker set for "the Barn Lot," a recorded plat of August 1879. (Exhibit 24).
[6] All of these markers are actual granite markers which still exist in their original location as verified by Mr. Greene and the other surveyors. Granite markers, known for the durability, are considered some of the most reliable boundary markers.
[7] He relies heavily on the Goff and Randall plat, Exhibit 26.
[8] Mr. Rashid used one marker at the corner of Ottawa and Pequot Streets as shown on plat card 168, Exhibit T, and another marker near 279 Pequot Street from another plat. Neither are shown on his "Survey and Plan," (joint exhibit 1C).
[9] In determining what constitutes a physical manifestation, our case law originally suggested that sleep would only be a sufficient physical manifestation to justify recovery under intentional infliction of emotional distress if a plaintiff provides medical evidence in support — not simply his or her own "self-serving" testimony — and can prove causation. Lee v. Gelineau, Not Reported in A.2d, 2001 WL 770932 *12 (R.I.Super. 2001). But in Adams v. Uno Restaurants, Inc., 794 A.2d 489,493 (R.I. 2002) (plaintiff did not need medical evidence to support the physical symptomatology because "clear objective and uncontroverted evidence" existed concerning defendant's wrongful conduct in initiating criminal proceedings against him). In Hawkins v. Scituate Oil Co.,723 A.2d 771 (R.I. 1999) plaintiff did not need to provide evidence of physical symptomatology plus medical-causation expertise to recover for discomfort in a property-loss case where tortfeasor's wrongdoing interfered with plaintiff's rightful occupancy of his or her premises. Sleep loss has been considered sufficient when it has been medically classified as post-traumatic stress disorder, which is also accompanied by other symptoms. See, e.g., Perrotti v. Gonicberg, 877 A.2d 631, 638
(R.I. 2005); Castellucci v. Battista, 847 A.2d 243, 249 (R.I. 2004).
[10] The Court will establish a status conference with counsel to schedule the trial on damages.