# United States Court of Appeals

## For the First Circuit

No. 04-1016

CASILDA ACOSTA, ETC., ET AL.,

Plaintiffs, Appellants,

v.

AMES DEPARTMENT STORES, INC., ET AL.,

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF RHODE ISLAND

[Hon. Ernest C. Torres, U.S. District Judge]

Before

Selya, Circuit Judge,

Coffin and Cyr, Senior Circuit Judges.

Bruce P. Gladstein on brief for appellants.
Marc DeSisto, Kathleen M. Daniels and DeSisto Law on brief for
appellees.

September 22, 2004

**SELYA**, **Circuit Judge**. Plaintiff-appellant Casilda Acosta invites us to vacate a summary judgment order terminating her suit for false arrest under, inter alia, 42 U.S.C. § 1983.[1] Discerning no error in the district court's disposition of the matter, we decline Acosta's invitation.

The facts are uncomplicated. Glenn Powers worked as a store detective for Ames Department Stores, Inc. (Ames). On October 18, 1999, he called the Middletown, Rhode Island, police department to report a shoplifting at a local Ames emporium. Officer Kelly Mitchell responded to the call and Powers informed her that the appellant, her sons, and a group of other persons had entered the shop that evening. He watched the appellant take two jackets, emblazoned with the logo of the New England Patriots, from a rack and outfit her sons with them. He then surveilled the trio as they walked around the store and proceeded through the checkout line without making any attempt to pay for the jackets.

Powers stopped the suspected shoplifters as soon as they left the premises. When he confronted them with the alleged larceny, one of the boys admitted that he had donned the jacket in the store.

---

[1]Casilda Acosta's sons, Kenny and Kevin, are also parties. Their claims are largely derivative, however, and for ease in reference we treat Casilda as if she were the sole plaintiff and appellant. Our opinion is, of course, binding on all three.

Once she had interviewed Powers, Officer Mitchell talked with the appellant. She found communication difficult because of a language barrier; Mitchell spoke no Spanish and the appellant lacked fluency in English. Nonetheless, Mitchell was able to glean the essence of the appellant's claim: that she had purchased the jackets on an earlier shopping trip. To bolster that claim, the appellant gave Mitchell a layaway receipt dated October 5, 1999. This receipt indicated that ten items had been rung up (including two labeled "PATRIOTS OUT" at a sale price of $22.41 each); that $49.94 had been paid toward a previous balance; and that the layaway was complete. The receipt did not indicate what "PATRIOTS OUT" meant.

Officer Mitchell then inspected the jackets. She observed a wet spot on one of them, consistent with what might appear if soda or juice had just been spilled on it. She also found a used tissue in a jacket pocket. At that point, Mitchell took the appellant into custody and charged her with shoplifting. Although at least one other officer had by then responded to the scene, the police did not converse with any other Ames personnel before effectuating the arrest. By the same token, they did not interview other customers (not even those persons who had originally accompanied the appellant to the store).

For reasons that need not concern us, the criminal charges were subsequently dropped. The incident, however, was not

forgotten.  The appellant brought suit in a Rhode Island state court alleging seventeen different causes of action against a myriad of defendants.  The complaint, as amended, named Ames, Powers, the Town of Middletown, the Middletown police department, the town's finance director, and several police officers (among them, Officer Mitchell) as defendants.[2]  The municipal defendants removed the case to the United States District Court for the District of Rhode Island.  See 28 U.S.C. §§ 1331, 1441(b).

In due course, the municipal defendants moved for summary judgment.  See Fed. R. Civ. P. 56.  The district court found probable cause for the arrest and, accordingly, granted the motion. This appeal ensued.

The summary judgment device enables a court "to pierce the boilerplate of the pleadings and assay the parties' proof in order to determine whether trial is actually required."  Wynne v. Tufts Univ. Sch. of Med., 976 F.2d 791, 794 (1st Cir. 1992).  That device functions successfully when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment

_____

[2]Ames and Powers made only cameo appearances — Ames went into bankruptcy and Powers was never served — so we eschew any further reference to them, instead treating the municipal defendants as if they were the sole targets of the suit.  See, e.g., Sunview Condo. Ass'n v. Flexel Int'l, Ltd., 116 F.3d 962, 963 n.1 (1st Cir. 1997) (taking a similar approach in analogous circumstances).

as a matter of law." Fed. R. Civ. P. 56(c). Faced with a properly documented summary judgment motion, the nonmovant can thwart the motion only by showing through materials of evidentiary quality that a genuine dispute exists about some material fact. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986); Medina-Munoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 8 (1st Cir. 1990). This evidence "must have substance in the sense that it limns differing versions of the truth which a factfinder must resolve at an ensuing trial." Mack v. Great Atl. & Pac. Tea Co., 871 F.2d 179, 181 (1st Cir. 1989).

In assessing such a proffer, an inquiring court must resolve all evidentiary conflicts and draw all reasonable inferences in the nonmovant's favor. Id. If the proffer, viewed through this prism, "is merely colorable, or is not significantly probative, summary judgment may be granted." Anderson, 477 U.S. at 249-50 (internal citations omitted). In an ensuing appeal, we afford plenary review, Mesnick v. Gen. Elec. Co., 950 F.2d 816, 822 (1st Cir. 1991); Garside v. Osco Drug, Inc., 895 F.2d 46, 48 (1st Cir. 1990), utilizing the same criteria as the trial court, Perez v. Volvo Car Corp., 247 F.3d 303, 310 (1st Cir. 2001); Werme v. Merrill, 84 F.3d 479, 482 (1st Cir. 1996).

We turn now from the general to the particular. Before us, the appellant mounts a four-pronged attack on the district court's probable cause determination. She contends (i) that the

existence vel non of probable cause is always for the jury (and, thus, not susceptible to summary judgment); (ii) that genuine issues of material fact preclude judicial resolution of the probable cause question here; (iii) that even absent such a dispute, the facts of record do not support the lower court's probable cause determination; and (iv) that, in all events, the determination was infirm because further investigation would have dispelled the basis for it. We discuss these contentions sequentially.

With respect to her first asseveration, the appellant relies upon our decision in B.C.R. Transport Co. v. Fontaine, 727 F.2d 7 (1st Cir. 1984). That reliance is mislaid. In B.C.R. Transport, the defendant argued that probable cause necessarily existed because a warrant, based upon information supplied by an alleged victim, had been obtained. Id. at 9-10. We rejected that broad proposition, describing the probable cause inquiry as situation-specific. See id. at 10 (explaining that "whether or not probable cause exists . . . invariably depends on the particular facts and circumstances of [each] case"). We went on to note that the alleged victim was disoriented and ranting, and, accordingly, the arresting officers needed to engage in further inquiry before relying on that account to find probable cause. See id. at 10-11.

The appellant tries to ride this horse well past the boundary that we staked out in B.C.R. Transport. Although we ruled

there that the issue of probable cause was for the jury, that ruling was not, as the appellant suggests, intended to have universal applicability. The outcome in B.C.R. Transport represented the exception, not the rule. More relevant here is our recent observation that "it is pointless to submit . . . [a] probable cause question[] to the jury at all unless the facts are disputed." Bolton v. Taylor, 367 F.3d 5, 8 n.2 (1st Cir. 2004); see also Ornelas v. United States, 517 U.S. 690, 696 (1996) (explaining that when the relevant facts leading to the officer's involvement are established, probable cause is a "mixed question of law and fact" suitable for determination by the court); Bell v. Irwin, 321 F.3d 637, 640 (7th Cir.) (holding that the existence of probable cause is ordinarily for the court, not for the jury), cert. denied, 124 S. Ct. 84 (2003).

In the case at hand, the material facts — what the police knew at the moment of the arrest, the source of their knowledge, and the leads that they pursued or eschewed — are not in dispute. When that is so, the existence vel non of probable cause ordinarily is amenable to summary judgment. See, e.g., Roche v. John Hancock Mut. Life Ins. Co., 81 F.3d 249, 254-56 (1st Cir. 1996) (affirming the entry of summary judgment in such a situation). The question, then, is whether brevis disposition was appropriate on the facts of this case.

The appellant's second argument begins the dialogue on that question. She hangs her hat primarily on the layaway receipt. This need not detain us. The dispute over the meaning of the layaway receipt is, at bottom, merely whether the receipt fairly indicated to a reasonable officer that the appellant purchased two Patriots jackets on October 5. Even were we to resolve this question in the appellant's favor, the fact that she bought two jackets on October 5 would not change the outcome of the probable cause inquiry.

There are at least two conflicting inferences that could be drawn from such a fact. One possibility is that the appellant bought the coats in question and did not steal them. Another is that she bought two other coats on October 5, and was using the receipt as a cover for a theft on October 18. To resolve the issue of probable cause, it does not matter which inference is correct. It is sufficient that a reasonable officer in possession of this information might nonetheless find it likely that the store detective's eyewitness account was true and that the appellant had committed a crime. See United States v. Figueroa, 818 F.2d 1020, 1023-24 (1st Cir. 1987). In light of Powers's insistence that he personally witnessed the theft, the exculpatory value of the receipt is simply insufficient for us to conclude that Mitchell could not reasonably have found probable cause.

The appellant's third line of attack directly challenges the adequacy of the evidence on which the district court's probable cause determination was based. That challenge requires us to limn the analytic framework for probable cause determinations and then to apply that framework.

When there is probable cause for an arrest, the Fourth Amendment's prohibition against unreasonable searches and seizures is not offended. Atwater v. Lago Vista, 532 U.S. 318, 354 (2001); Roche, 81 F.3d at 254. Probable cause for an arrest exists when the arresting officer, acting upon apparently trustworthy information, reasonably concludes that a crime has been (or is about to be) committed and that the putative arrestee likely is one of the perpetrators. See Beck v. Ohio, 379 U.S. 89, 91 (1964); Figueroa, 818 F.2d at 1023. Courts use an objective standard when determining the existence of probable cause. Valente v. Wallace, 332 F.3d 30, 32 (1st Cir. 2003); Roche, 81 F.3d at 254. The focus is not on certitude, but, rather, on the likelihood of criminal activity. See Illinois v. Gates, 462 U.S. 213, 235 (1983); Spinelli v. United States, 393 U.S. 410, 419 (1969); United States v. Winchenbach, 197 F.3d 548, 555 (1st Cir. 1999). Finally, courts must apply these principles fluidly to the totality of the extant circumstances. Gates, 462 U.S. at 232 & n.7; Winchenbach, 197 F.3d at 555.

Here, the existence of probable cause depends, in the first instance, upon the cogency of the account given by the store detective (Powers). Taken at face value, Powers's tale certainly gave Officer Mitchell reason to believe that a crime had been committed and that the appellant had committed it. The appellant nonetheless argues that Mitchell should have deemed Powers's statements unreliable (or, at least, suspect) because she had never met him before and, thus, could not accurately assess his credibility. That sets the bar too high.

Victims' complaints are a prime source of investigatory information for police officers. In the absence of circumstances that would raise a reasonably prudent officer's antennae, there is no requirement that the officer corroborate every aspect of every complaint with extrinsic information. The uncorroborated testimony of a victim or other percipient witness, standing alone, ordinarily can support a finding of probable cause. See, e.g., Forest v. Pawtucket Police Dep't, ___ F.3d ___, ___ (1st Cir. 2004) [No. 03-2652, slip op. at 10] (stating that information furnished by a victim is generally considered sufficiently reliable to support a finding of probable cause); B.C.R. Transport, 727 F.2d at 10 (same). Although the victim here is a corporation communicating through its agent, the agent held himself out to be an eyewitness to the pilferage and rendered a coherent, facially plausible account. Consequently, we see no reason to treat Ames's complaint

-10-

of a crime, related through Powers, differently from any other complaint by a victim.

This conclusion is reinforced by Powers's status as a store detective. At least one respected court has gone so far as to recognize that, in the retail context, private security officers are inherently reliable. See Gramemos v. Jewel Cos., 797 F.2d 432, 439 (7th Cir. 1986) (noting that several disincentives stemming from false crime reports collectively provide reason to infer that store detectives are reliable). While we hesitate to indulge in sweeping generalizations, we think that in this case Officer Mitchell had every reason to believe that the store's security officer was being truthful.

In an effort to undermine the credibility of Powers's statements, the appellant points to three facts: the layaway receipt, the absence of any evidence of empty coat hangers or price tags for the jackets, and the "used" appearance of one of the jackets. In our estimation, none of these facts is telling. As noted above, the layaway receipt is at best equivocal. As for the hangers and price tags, Mitchell never thought to ask for them — and it is therefore speculative whether or not they could have been found. And, finally, the appearance of the spotted jacket actually may cut the other way: the fact that the spots were wet contradicts the appellant's suggestion that they were old. The used kleenex in the pocket tells us nothing.

-11-

To cinch matters, the totality of the circumstances includes far more than these isolated tidbits. Officer Mitchell spoke first-hand with the complaining witness, who plausibly claimed to have observed the entire incident. Mitchell had no reason to doubt that claim. She then was told that one of the jacket-wearers had admitted to having donned the jacket inside the store. Mitchell proceeded to speak to the appellant and got the gist of her story: that she previously had purchased the merchandise. But the layaway receipt that she proffered was ambiguous and gave the officer no reason to question Powers's veracity: he was a percipient witness whose job responsibilities involved the very sort of observations that he was undertaking. Hence, there was no reason for Mitchell not to rely on his eyewitness version of events. When an arresting officer has the benefit of an apparently credible eyewitness account, the amount of arguably exculpatory evidence must be substantial before further investigation can be required as a constitutional matter. The evidence here, if exculpatory at all, was far from substantial.

The test for probable cause "does not require the officers' conclusion to be ironclad, or even highly probable. Their conclusion that probable cause exists need only be reasonable." Winchenbach, 197 F.3d at 555-56. In this case, the officer passed that test with flying colors.

The appellant's last argument depends on a three-part algorithm. She asserts that even if the investigation that Officer Mitchell actually conducted created an aura of probable cause, the district court's determination cannot stand because (i) the police had a responsibility to continue investigating the matter; (ii) they failed to do so; and (iii) had they not foregone this duty, they would have dispelled the aura and learned that there was no probable cause for an arrest. In particular, the appellant posits that the police should have interviewed the other Spanish-speaking persons who had accompanied her to the store, spoken with the store manager, probed further into the significance (if any) of the layaway receipt, and hunted for the hangers and price tags.

Probable cause determinations are, virtually by definition, preliminary and tentative. See, e.g., Barber v. Page, 390 U.S. 719, 725 (1968). Not surprisingly, then, the Supreme Court has flatly rejected the idea that the police have a standing obligation to investigate potential defenses before finding probable cause. See Baker v. McCollan, 443 U.S. 137, 145-46 (1979). Following this lead, we too have disclaimed any unflagging duty on the part of law enforcement officers to investigate fully before making a probable cause determination. See, e.g., Franco-de Jerez v. Burgos, 876 F.2d 1038, 1042 (1st Cir. 1989). While we have recognized that such a duty may arise in highly idiosyncratic circumstances, see, e.g., B.C.R. Transport, 727 F.2d at 10-11, we

-13-

have made it clear that an officer normally may terminate her investigation when she accumulates facts that demonstrate sufficient probable cause. See, e.g., Forest, ___ F.3d at ___ [slip op. at 12]; Palhava de Varella-Cid v. Boston Five Cents Savings Bank, 787 F.2d 676, 680-81 (1st Cir. 1986). The case law in other circuits is to the same effect. See, e.g., Hodgkins v. Peterson, 355 F.3d 1048, 1061 (7th Cir. 2004); Brodnicki v. City of Omaha, 75 F.3d 1261, 1264 (8th Cir. 1996).

The rule, then, applicable in the wide mine-run of cases, is that once a law enforcement officer unearths sufficient facts to establish probable cause, she has no constitutional duty either to explore the possibility that exculpatory evidence may exist or to conduct any further investigation in the hope of finding such evidence. Because this case is well within the mine-run, we reject the appellant's asseveration that the absence of a more complete investigation somehow undercuts the district court's acknowledgment of probable cause.

This disposes of the appellant's four-pronged attack on the lower court's probable cause determination. Looking at the totality of the circumstances known to the police at the time of the instant arrest, we find no fault with the district court's conclusion that probable cause existed.

Withal, our odyssey must continue. The court below went on to rule that the absence of probable cause doomed all the

-14-

appellant's claims.  The appellant assigns error to the breadth of this ukase.

This assignment of error requires us first to parse the amended complaint.  Eight of the counts are directed only at Ames and Powers, and, thus, need not concern us.  See supra note 2.  The remaining nine counts allege the following causes of action against some or all of the municipal defendants:  four counts based on 42 U.S.C. § 1983,[3] one count based on false arrest, one count based on general negligence, two counts charging inflicting of emotional distress, and one count based on vicarious liability.  The two main section 1983 claims were premised on alleged Fourth Amendment violations, and so the district court's disposition of those counts was clearly correct.  Given probable cause, there was no constitutional violation — and without the deprivation of a constitutional right, those claims cannot proceed.  See Roche, 81 F.3d at 254.  The false arrest count also fails because a necessary element of that claim is an illegal arrest.  See Mann v. Cannon, 731 F.2d 54, 62 (1st Cir. 1984) (construing Rhode Island law).  In this case, the existence of probable cause rendered the arrest legal.  By like token, in the absence of a false or unconstitutional arrest, the two other section 1983 counts — both of which are failure-to-train counts, see supra note 3 —

_____

[3]Two of these are "deliberate indifference" counts based on alleged failures properly to train police officers.

-15-

necessarily founder.  See Evans v. Avery, 100 F.3d 1033, 1040 (1st Cir. 1996) (holding that a municipality cannot be liable for failure to train under § 1983 absent an underlying constitutional violation by one of its police officers).

That leaves only a motley of state-law tort counts.  A general negligence count requires a plaintiff to show, at a bare minimum, a legally cognizable duty and a breach of that duty.  See Mills v. State Sales, Inc., 824 A.2d 461, 467 (R.I. 2003); see also Welsh Mfg., Div. of Textron, Inc. v. Pinkerton's, Inc., 474 A.2d 436, 440-41 (R.I. 1984).  Because the police acted reasonably in making their probable cause determination and had no duty to investigate further before arresting the appellant, see text supra, the appellant has failed to establish the essential elements of her general negligence claim.

The emotional distress counts fare no better.  There has been no demonstration of the "extreme and outrageous conduct" necessary to prevail on a claim for intentional infliction of emotional distress.  Jalowy v. Friendly Home, Inc., 818 A.2d 698, 707 (R.I. 2003).  There has been no showing of the physical symptomatology necessary to support a claim of negligent infliction of emotional distress.  See Reilly v. United States, 547 A.2d 894, 899 (R.I. 1988).  And as the substantive state-law counts topple, so too does the count alleging vicarious liability.  See Boland v. Town of Tiverton, 670 A.2d 1245, 1248 (R.I. 1996).

-16-

We need go no further.  While we do not minimize the unfortunate nature of the appellant's experience, there is no principled way on these facts to hold the municipal defendants liable in damages.  Consequently, the district court's entry of summary judgment merits our approbation.

**<u>Affirmed</u>**.