**Marilyn ROSA, et al., Plaintiffs,**

v.

**HOSPITAL AUXILIO MUTUO DE PUERTO RICO, INC. and Sociedad Espanola de Auxilio Mutuo y Beneficiencia, et al., Defendants.**

Civil No. 02–2350 (DRD).

United States District Court,
D. Puerto Rico.

March 31, 2009.

Doris Quinones–Tridas, Luisa Velazquez–Aparicio, Quinones Tridas Law Office, PSC, Jaime E. Morales–Morales, Morales–Morales Law Offices, Jose A. Gonzales–Villamil, Gonzales–Villamil Law Office, Juan Antonio Pedrero–Lozada, Arroyo, Monrouzean & Associates, Jorge J. Lopez–Lopez, Otero & Lopez, LLP, Freddie Perez–Gonzalez, Freddie Perez Gonzalez & Assoc., PSC, Jose L. Gonzalez–Castaner, Gonzalez Castaner & Morales Cordero Law Office, Maria C Taboas, Freddler, Gonzalez and Rodriguez, Luiz F. Montijo, Montijo & Montijo Law Office, San Juan PR, for Defendants.

Julio Cesar Alejandro–Serrano, Luis Alvarado–Hernandez, Luis A. Rodriguez–Munoz, Eduardo A. Vera–Ramirez, Landron & Vera LLP, Guaynabo, PR, for Plaintiffs.

## OPINION AND ORDER

DANIEL R. DOMÍNGUEZ, District Judge.

Pending before the Court are the following motions, to wit: (a) *Motion For Summary Judgment* filed by defendant Dr. Miguel Garratón ("Garratón") (Docket No. 196); (b) *Motion For Summary Judgment* filed by defendants Drs. Zulma González ("González"); Miguel Garratón; Eugenio Portela ("Portela"); Hospital Auxilio Mutuo de Puerto Rico, Inc. and Sociedad Española de Auxilio Mutuo y Beneficiencia ("Auxilio Mutuo") (Docket No. 197); and (c) *Motion For Summary Judgment And Memorandum In Support Thereof* filed by Dr. Portela (Docket No. 200). Dr. González' motion joining the motions for summary judgment filed by Drs. Garratón and Portela was granted by the Court on April 24, 2008 (Docket No. 204). On May 23, 3008, plaintiffs opposed the motions for summary judgment (Docket No. 205), and on May 30, 2008, plaintiffs moved for the voluntary dismissal with prejudice as to defendants Drs. Noel Totti III and Alvaro U. Aranda based on a settlement agreement reached amongst the parties (Docket No. 206). Dr. Portela replied to plaintiffs' opposition on June 23, 2008 (Docket entries No. 210 and 211). Plaintiffs filed a sur-reply on July 7, 2008 (Docket No. 219).

This case was referred to Chief, U.S. Magistrate Judge Justo Arenas ("Magistrate Judge") for a report and recommendation on October 28, 2008 (Docket entries No. 228 and 229). On January 21, 2009, the Magistrate Judge issued two reports, *Magistrate Judge's Report And Recommendation* (Docket No. 228), and *Magistrate Judge's Report And Recommendation* (Docket No. 229). The Magistrate Judge recommended that the motion for summary judgment filed by defendants Auxilio Mutuo, and Drs. González, Garratón and Portela (Docket No. 228), be denied, as the Magistrate Judge found that there is a genuine issue of material fact as to the date when the statute of limitations under applicable Puerto Rico tort law began to run.

The Magistrate Judge also recommended that the motions for summary judgment filed by Drs. Garratón, Portela and González (Docket entries No. 196 and 200), be granted, as "Plaintiff's own expert has admitted that the primary underlying source of plaintiff's injury, subglottic stenosis, has already developed before any of the moving defendants cared for her." *See Report and Recommendation* (Docket No. 229). As to the medical care provided by Drs. González and Garratón, the Magistrate Judge found that "plaintiff's expert admits that he cannot identify any injury resulting from their care." *Id.* "As to Dr. Portela, the most the expert can do is speculate, which is not sufficient meet plaintiff's burden of raising a question of material fact as to the issue of damages." *Id.*

The Magistrate Judge entered both *Reports and Recommendation* on January 21, 2009 (Docket entries No. 228 and 229). As provided by Rule 72(b) of the Federal Rules of Civil Procedure ("Fed.R.Civ.P."); Rule 72(d) of the Local Civil Rules for the United District Court of Puerto Rico ("Local Civil Rules"), and this Court's *Order* of October 28, 2008 (Docket No. 226), the *Report and Recommendation* notes that "any party who objects to this report and recommendation must file a written objection thereto with the Clerk of this Court within five (5) days of the party's receipt of this report and recommendation." The Court notes, however, that the Magistrate Judge granted the parties ten (10) days to object. *See Reports and Recommendation* (Docket entries No. 228 and 229). The record shows that Auxilio Mutuo filed its objection the same day that the reports were entered, hence, an order to shorten the time allowed by the Magistrate Judge to object is not warranted.

## Analysis

▮▮▮ Any written objections must specifically identify the portions of the proposed findings, recommendations or report to which objection is made and the legal basis for such objections. L.Civ.R. 72(c). Failure to file objections within the specified time waives the right to appeal the District Court's order. *U.S. v. Valencia–Copete,* 792 F.2d 4, 6 (1st Cir.1986). Additionally, claims which are not preserved by such objections are precluded upon appeal. *Davet v. Maccarone,* 973 F.2d 22, 30–31 (1st Cir.1992). Thus, timely objections are required in order to challenge the findings of a magistrate's recommendation, as well as the magistrate's failure to make additional findings. *Henley Drilling Co. v. McGee,* 36 F.3d 143, 150–151 (1st Cir. 1994). Additionally, only objections to the magistrate's recommendation which are specified are preserved. *Lewry v. Town of Standish,* 984 F.2d 25, 27 (1st Cir.1993). Therefore, the objecting party is only entitled to a *de novo* review of the issues which are specifically raised by the objection. *See, e.g. U.S. v. Valencia–Copete,* 792 F.2d 4, 6 (1st Cir.1986); *See also Gioiosa v. U.S.,* 684 F.2d 176, 178 (1st Cir.1982).

Fed.R.Civ.P. 72(b) provides that "[t]he district judge must determine *de novo* any part of the magistrate judge's disposition that has been properly objected to. The district judge may accept, reject or modify the recommended disposition...." Local Civil Rule 72(d) provides that "a district judge shall make a *de novo* determination of those portions to which objection is made and may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." The Court, however, is bound to make a *de novo* review when the objecting party has filed its objections timely. In the instant case, the record shows that both plaintiffs and defendants filed their objections timely.

## Factual and Procedural Background

The Court will incorporate the general findings of fact excellently presented by the Magistrate Judge that are uncontested:

Rosa is a citizen of the state of New Jersey with a history of diabetes and kidney failure who was on immunosuppresive medications when she visited Puerto Rico in November 2000. After experiencing nausea and vomiting, she was admitted to Hospital Auxilio Mutuo on November 10, 2000. (Docket No. 138, at 1, ¶ 1, at 3, ¶ 18; Docket No. 161–2, at 2, ¶ 3.) She was treated for convulsions, hypertension, and hyperglycemia with blood sugar in excess of 1,000. (Docket No. 199–2, at 1, July 7, 2002 Letter from Dr. John A. Cece ("Cece Letter").) Due to respiratory problems and sepsis, Rosa was endotracheally intubated on November 12, 2000, and remained intubated for the majority of the eight weeks she spent at the hospital, with some number of interruptions in intubation. (Docket No. 161–2, at 2, ¶ 3.) A neurologist noted on November 20, 2000 that a tracheostomy was highly recommended, and noted on November 22 that it should be performed "now." A tracheostomy was performed on December 1, 2000.

On November 28, Rosa was extubated and reintubated. Her tracheostomy tube was changed on December 12, but due to difficulty in respiration, she was again endotracheally intubated and the tracheostomy tube was removed. Again on December 19 she was extubated and reintubated. On December 22, Dr. Garratón noted the need for a longer tracheostomy tube, but placed an endotracheal tube through the tracheostomy and secured it while another tube could be found. A note of December 31, 2000 shows that a long tube was still unavailable on that date. On December 23, the endotracheal tube came off or was removed and Rosa was left without a tube. A tracheostomy was successfully performed with a regular tracheostomy tube on January 1, 2001. No further tracheostomy problems were noted from that time to the time of Rosa's discharge from Auxilio Mutuo on January 10, 2001. (Docket No. 161–2.)

Upon discharge, Rosa's tracheostomy device was not removed, and she was informed that she should follow up with her hometown hospital facility in New Jersey to have it removed. (Docket No. 199, at 2, ¶ 7.) She was admitted to The General Hospital Center at Passaic on January 11, 2001. (Docket No. 199–2, at 1, Cece Letter.) There, Dr. Eric Joseph made a diagnosis of "tracheostomy with subglottic granulation tissue which was prohibiting decannulation or removal of the tracheostomy tube." (Id. at 1–2.) The record does not indicate whether this diagnosis was communicated to Rosa. Rosa then saw Dr. John A. Cece on January 19, 2001, at which time she complained of intermittent shortness of breath, difficulty breathing with accompanying cough and expectoration of mucus, and a tendency for the tracheostomy tube to get partially blocked with mucus. She reported difficulty speaking with the tracheostomy tube and difficulty sleeping. She also complained of headaches, weakness, and easy fatigability. Dr. Cece's impression was "subglottic stenosis [narrowing] with accompanying granulation tissue and impairment of the laryngeal airway prohibiting removal of the tracheostomy tube." (Docket No. 199–2, at 2, Cece Letter.) With regards to this January 19 visit, Rosa's deposition testimony is as follows:

Q. OK. OK. At any time did Doctor Cece, in that first visit, explain to you if you had any granulated tissue due to the tracheotomy? Or that the tracheotomy

performed had occasioned the problem that you had in the speech?

A. That's it, the second thing you said.
...

Q. OK. And you had been explained ...? The ... did you explain to Doctor Cece that that was caused y the ... the tracheotomy performed at the Auxilio Mutuo Hospital? Right?

A. Yes.

(Docket No. 199–3, at 3–4, Deposition of Marilyn Rosa taken March 8, 2005 ("2005 Deposition").) During this first visit Dr. Cece also explained to Rosa that the problems she had in her throat and with her speech, as well as the discomfort she was experiencing, were due not only to the tracheostomy performed at Auxilio Mutuo, but also to the process of intubation performed there. (*Id.* at 5:22–25, at 6:1–9.) It is unclear whether Dr. Cece advised Rosa during this visit of any potential difficulties in removing the tube. (Docket No. 199–4, at 2–8, Deposition of Marilyn Rosa taken August 6, 2007 ("2007 Deposition"); Docket No. 199–2, at 2, ¶ 2, Cece Letter.) It is in fact unclear whether she was told of any such difficulties at all by anyone prior to March 30, 2001.

On March 30, 2001, Dr. Cece performed a direct-microlaryngoscopy and rigid esophagoscopy upon Rosa under general anesthesia. (Docket No. 199–2, at 2, ¶ 7, Cece Letter.) Dr. Cece then explained to Rosa and her husband that "the laryngeal airway was inadequate to allow removal of the tracheostomy tube" and that "her prognosis for removal of the tracheostomy tube was poor." (*Id.*) Dr. Cece referred Rosa to Dr. Peak Woo of Mount Sinai Hospital, who performed a laryngeal electromyography ("EMG") on April 10, 2002. It was Dr. Woo who first told Rosa that the tube would never be able to be removed from her throat. (Docket No. 199–3, at 7, 2005 Deposi-

tion.) Dr. Cece also explained to Rosa that, "in view of the physical findings and EMG results of April 10, 2002, the tracheostomy tube could not be removed...." (Docket No. 199–2, at 3, ¶ 6, Cece Letter.) At some point, Dr. Cece told Rosa that the reason for her trachea's closure was that Auxilio Mutuo Hospital had left the tubes in too long, but the record is unclear as to when Cece informed her of this. (Docket No. 199–3, at 7–8, 2005 Deposition; Docket No. 199–4, at 7–8, 2007 Deposition.) Rosa also came to believe that Auxilio Mutuo was guilty for the inability to remove the tube, but again, the record is not clear as to when she came to believe this. (Docket No. 199–4, at 11, 2007 Deposition.)

On February 26, 2002 Rosa's legal counsel sent a letter to Hospital Auxilio Mutuo seeking compensation for Rosa's damages. (Docket No. 199–5.) More than one year had expired from the date of Rosa's first consultation with Dr. Cece on January 19, 2001, but less than one year had passed from March 30, 2001, when Dr. Cece told her the prognosis for removal of the tube was poor. Rosa filed her first complaint on September 6, 2002. (Docket No. 1.)

A review of the objections filed by the parties show that the general facts that triggered the instant action are uncontested, except for the date when plaintiff Marilyn Rosa ("Rosa") learned that "the tube in her throat might remain there permanently." *See Report and Recommendation* (Docket No. 228). The Magistrate Judge further found: "Such information might have been sufficiently abnormal to require due diligence on Rosa's part to determine whether defendants were negligent." *Id.* "As it stands, however, the record contains no evidence that Rosa was informed about the possible permanency of the tube before March 30, 2001, which was within a year of

February 26, 2002." *Id.* "Accordingly, it is recommended that defendants' motion for summary judgment based on the defense of limitations be DENIED." *Id.* "It is important to note that this determination is not a signal as to the ultimate outcome of the statute of limitations issue. It is certainly plausible that, upon further development of the record, a fact finder may determine that Rosa knew either of the tube's permanency prior to February 26, 2001." *Id.*

For the reasons set forth below, the Court disagrees with the final recommendation made by the Magistrate Judge, only as to the underlying period of the statute of limitations (Docket No. 228). In view of the fact that the core of this case is the date when the statute of limitations began to run, the Court will consider this issue only, as it is determinative in the disposition of this case. Hence, the Court now makes additional findings of fact based solely on the record submitted by the parties.

Plaintiff Rosa was deposed on March 8, 2005 (Docket No. 199, Exhibit No. 2, pages 7–9), and the record shows in its relevant part:

Q. And that that [sic] your trachea was closed has already been explained to you by Doctor Cece also?

A. Correct.

Q. And Doctor Cece had told you that you had the trachea closed, because at the Auxilio Mutuo Hospital they had left the tubes too much time?

A. Doctor Cece told me that.

Q. That's why, ... Doctor Cece told you: "Look you have the trachea closed because at the Auxilio Mutuo Hospital they left the tubes in too long a time." That was what he told you.

A. Correct.

Plaintiff was again deposed on August 6, 2007 (Docket No. 199, Exhibit No. 3, pages 2–11), of the record shows in its relevant part:

Q. And what doctor did you see?

A. Doctor Cece.

Q. That was the first physician, the first physician you saw in the United States after you were discharged from the Auxilio Mutuo?

A. Yes.

Q. And he was the first one to explain to you why they couldn't take the tracheotomy tube out, is that right?

A. Well, he gave me some instructions.

Q. Yes, but ...

A. But he sent me to Dr. Woo (phonetic) in New York, who is another trachea specialist. And he was the one who told me that, and Dr. Cece also.

Q. He said what?

A. That this was permanent that they couldn't take it out ... that I would have this in my throat for the rest of my life.

Q. And that this was due to the fact that they had kept you intubated for too long at Auxilio Mutuo?

A. That's right.

. . .

Q. Madam, after you were discharged from Auxilio Mutuo, how long after the discharge did you go to see Dr. Cece?

A. As soon as I got to New Jersey.

Q. In other words it was very soon.

A. Yes.

. . .

Q. In other words, a month after you arrived in the United States, you had already seen Dr. Cece and Dr. Woo.

A. Not that fast. I mean, I arrived ... because everything is by appointment. I got there, I saw Dr. Cece, Dr. Cece made me an appointment with Dr. Woo. It must have taken one week or two or three weeks for Dr. Woo to see me.

. . .

Q. Would it be correct to say that you went to see Dr. Cece to have him take the tracheotomy tube out.

A. That is right.

The record further supports that plaintiff Rosa was examined and evaluated by Dr. John A. Cece, on January 19, 2001, shortly after plaintiff's arrival to the United States. *See* Docket No. 199, Exhibit No. 1, Dr. Cece's letter of July 7, 2002. The Court notes that plaintiff was discharged from Auxilio Mutuo on January 10, 2001, and on January 11, 2001 she was first evaluated by Dr. Eric M. Joseph, who is Dr. Cece's associate, at the General Hospital at Passaic, New Jersey. *Id.* At that time, Dr. Joseph "made a diagnosis of tracheostomy with subglottic granulation tissue which was **prohibiting decannulation or removal of the tracheostomy tube.**" (Emphasis added). *See* Docket No. 199, Exhibit No. 1.

Dr. Cece further describes his impression of plaintiff's evaluation on January 19, 2001, as follows:

My impression was subglomic sterosis with accompanying granulation tissue and impairment of the laryngeal airway **prohibiting removal of the tracheostomy tube.** Direct laryngoscopy for further evaluation was suggested.... I performed direct microlaryngoscopy and rigid esophagoscopy under general anesthesia upon Ms. Rosa on March 30, 2001. Findings at this procedure were marked subglottic and laryngeal stenosis with marked impairment of the laryngeal airway. There was also redundancy and swelling of the arythencids and supra-

glottic larynx which did not appear to be significantly contributing to the obstruction. I explained to both Ms. Rosa and her husband that the laryngeal airway was inadequate to allow removal of the tracheostomy tube because of the previously mentioned findings. I also explained that her prognosis for removal of the tracheostomy tube was poor. (Emphasis supplied).

*See* Docket No. 199, Exhibit No. 1. Dr. Cece further explained in his report that, "[t]he likelihood of laryngeal sublottic stenosis is proportional to the length of time a patient remains endotracheally intubated. *Id.* "Although **laryngeal subglottic stenosis can result from short periods of intubation of only one to two days,** it is more likely to occur and be more severe after longer periods of intubation." (Emphasis added). *See* Docket No. 199, Exhibit No. 1.

Lastly, it is worth to cite Dr. Cece's medical opinion of plaintiff's medical scenario and her prognosis:

It is my medical opinion that Ms. Marilyn Rosa's laryngeal subglottic stenosis is secondary to the endotracheal intubation she underwent while she was hospitalized at the Auxilio Mutuo Hospital in Puerto Rico. **Although a shorter intubation period and earlier tracheostomy would not have guaranteed the avoidance of laryngeal subglottic stenosis, the occurrence of laryngeal subglottic stenosis would have much more likely been avoided had a shorter period of intubations and a more prompt tracheostomy within 14 days of initial intubation has been recommended.** In the absence of **extenuating circumstances** that would prevent the performance of a prompt tracheostomy, and because of the increased likelihood of laryngeal and subglottic complications resulting from prolonged

intubation, persistent intubation beyond 14 days would be considered a deviation from the standard of care. (Emphasis added).

*See* Docket No. 199, Exhibit No. 1.

In sum, according to Dr. Cece's medical opinion, the condition that plaintiff developed from the intubation which impaired the removal of plaintiff's tracheostomy tube may have developed as soon as 24 hours from having being intubated, or after a prolonged period of time. The Court finds that the record is devoid of information to confirm the date when the condition of subglottic stenosis first developed.

Moreover, it is uncontested that the medical history of plaintiff was a critical one at the time she was admitted at Auxilio Mutuo, and at the time she was evaluated by doctors Eric M. Joseph, John A. Cece in January 2001; Dr. Peak Woo on March 28, 2002; and Dr. Erik Genden on December 21, 2001 (whose assessment "was true vocal cord paralysis which may have resulted from cerebral edema one year prior"). *See* Docket No. 199, Exhibit No. 1. In sum, unfortunately many medical factors due to Rosa's poor medical condition may have trigger plaintiff's need to have a permanent tracheostomy tube.

As stated by Dr. Cece's letter of July 7, 2002 assessment of plaintiff, "[h]er overall poor medical condition with accompanying problems of insulin-dependent diabetes mellitus and chronical renal failure would increase the likelihood of failure of reconstructive surgery, and the potential likelihood of serious postoperative complications for Ms. Rosa." *See* Docket No. 199, Exhibit No. 1. Without corrective surgery, Ms. Rosa will require the tracheostomy tube for the rest of her life." *Id.*

A similar prognosis was made by Dr. Woo, in his medical report dated March 28, 2002:

It is my estimation that ante posterior cricoid split with laryngeal split followed by reconstruction using cartilage graft and long-term stenting can be attempted. Because of the severity of the stenosis, I feel that the failure rate especially with her severe diabetes and transplant status is high. I estimate at least a 40% failure rate of the cartilage graft as well as other possibility with laryngeal stenosis management. Other options of laryngeal transplantations was discussed with her. Although she is on immunosuppressant, I do not think that we are quite ready for this at this center especially in view of the fact that there has only been one successful laryngeal transplant done in the past.

*See* Docket No. 205, Exhibit No. 3.

After a careful review of the findings of fact, as supplemented herein, the Court finds that plaintiff's medical condition was "poor," with "severe diabetes," "insulin dependent," and "chronical renal failure" even before she was admitted in Auxilio Mutuo on or about November 2001. Moreover, plaintiffs knew that Rosa's tracheostomy tube cannot be removed, or that removal prospective of the tube were poor, since January 11, 2001, when the tracheostomy tube could not be removed by Dr. Joseph when Rosa was initially evaluated, and later confirmed on January 19, 2001, when Dr. Cece first evaluated Rosa. *See* Docket No. 199, Exhibit No. 1.

The Court finds that any follow up medical procedures were recommended by Dr. Cece as a result of his initial prognosis on January 19, 2001. *See* Docket No. 199, Exhibit No. 1. As a matter of fact, it is uncontested by plaintiffs that it was Dr. Cece who referred her to be evaluated by other doctors after his initial prognosis. Lastly, it is uncontested that plaintiffs did not present any evidence to rebut the testimony of plaintiff Rosa, wherein she admitted that it was Dr. Cece who first told her that the tracheostomy tube cannot be

removed. *See* Docket No. 199, Exhibits No. 2 and 3.

### The Summary Judgment Standard

Generally, "[s]ummary judgment is appropriate when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law based on the pleadings, depositions, answers to interrogatories, admissions on file, and any affidavits. *See* Fed.R.Civ.P. 56(c); *Thompson v. Coca–Cola, Co.*, 522 F.3d 168, 175 (1st Cir.2008)." *Rodríguez–Rivera, et al. v. Federico Trilla Regional Hospital of Carolina, et al.*, 532 F.3d 28, 30 (1st Cir.2008). "A dispute is genuine if the evidence about the fact is such that a reasonable jury could resolve the point in the favor of the non-moving party." (Citations omitted). *Id.* "A fact is material if it has the potential of determining the outcome of the litigation." *Id.,* citing *Maymi v. P.R. Ports Authority*, 515 F.3d 20, 25 (1st Cir.2008). "A trial worth issue exists if the evidence is such that there is a factual controversy pertaining to an issue that may affect the outcome of the litigation under the governing law, and the evidence is 'sufficiently open-ended to permit a rational factfinder to resolve the issue in favor of either side.'" *Rojas–Ithier, et al. v. Sociedad Espanola de Auxilio Mutuo y Beneficiencia de Puerto Rico, et al.*, 394 F.3d 40, 42–43 (1st Cir.2005), citing *De Jesus Adorno v. Browning Ferris Indus.*, 160 F.3d 839, 841–42 (1st Cir.1998) (quoting *Nat'l Amusements, Inc. v. Town of Dedham*, 43 F.3d 731, 735 (1st Cir.1995)). "The Court views the record on summary judgment in the light most favorable to the nonmovant." *Id.*

"The object of summary judgment is 'to pierce the boilerplate of the pleadings and assay the parties' proof in order to determine whether trial is actually required.'" *Dávila v. Corporación de Puerto Rico Para La Difusión Pública*, 498 F.3d 9, 12 (1st Cir.2007), citing from *Acosta v. Ames Dep't Stores, Inc.*, 386 F.3d 5, 7 (1st Cir. 2004) (quoting *Wynne v. Tufts Univ. Sch. of Med.*, 976 F.2d 791, 794 (1st Cir.1992)). In *Dávila*, the Court held:

Thus, summary judgment is appropriate only when the record "show[s] that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c).

For this purpose, an issue is genuine if a reasonable jury could resolve the point in favor of the nonmoving party. *Suarez v. Pueblo Int'l, Inc.*, 229 F.3d 49, 53 (1st Cir.2000). By like token, a fact is material if it has the potential to determine the outcome of the litigation. *See Calvi v. Knox County*, 470 F.3d 422, 426 (1st Cir.2006). Where, as here, the non-movant has the burden of proof and the evidence on one or more of the critical issues in the case "is ... not significantly probative, summary judgment may be granted." *Acosta*, 386 F.3d at 8 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)).

When reviewing *de novo*, the court "must scrutinize the evidence in the light most agreeable to the nonmoving party, giving that party the benefit of any and all reasonable inferences." *Noviello v. City of Boston*, 398 F.3d 76, 84 (1st Cir.2005), citing *Cox v. Hainey*, 391 F.3d 25, 27 (1st Cir.2004). "[T]he nonmovant bears 'the burden of producing specific facts sufficient to deflect the swing of the summary judgment scythe.'" *Noviello*, 398 F.3d at 84, citing *Mulvihill v. Top–Flite Golf Co.*, 335 F.3d 15, 19 (1st Cir.2003). *See also, Dávila*, 498 F.3d 9. "Those facts, typically set forth in affidavits, depositions, and the like, must have evidentiary value; as a rule, '[e]vidence that is inadmissible at trial, such as, inadmissible hearsay, may not be considered on summary judgment.'"

*Noviello,* 398 F.3d at 84, citing *Vazquez v. Lopez–Rosario,* 134 F.3d 28, 33 (1st Cir. 1998); *accord Garside v. Osco Drug, Inc.,* 895 F.2d 46, 48 (1st Cir.1990). "The evidence presented by the non-moving party may not be 'conclusory allegations, improbable inferences, [or] unsupported speculation.'" *Torres–Negrón v. Merck & Company, Inc., et al.,* 488 F.3d 34, 39 (1st Cir.2007), citing *Medina–Munoz v. R.J. Reynolds Tobacco Co.,* 896 F.2d 5, 8 (1st Cir.1990). Based on this premise, the Court proceeds with the analysis.

### Applicable Law and Discussion

The Court hereby incorporates the Magistrate Judge's legal discussion included in the *Report and Recommendation* (Docket No. 228):

In Puerto Rico, "[p]rofessional malpractice actions are governed by sec. 1802 of the Civil Code, 31 L.P.R.A. § 5141...." *Ortega v. Pou,* 135 D.P.R. 711 (1994). Section 1802 provides that "[a] person who by an act or omission causes damage to another through fault or negligence shall be obliged to repair the damage so done." P.R. Laws Ann. tit. 31, § 5141. Any action under section 5141 is governed by a one year statute of limitations. P.R. Laws Ann. tit. 31, § 5298; *Torres v. E.I. Dupont De Nemours & Co.,* 219 F.3d 13, 18 (1st Cir. 2000).

#### A. Tolling

The two issues at hand are (a) when the statute began to run, and (b) whether the statute was subsequently tolled for any reason. I first address the more straightforward issue of tolling. The "tolling acts under Puerto Rican law have the effect of causing the limitations period to run anew for another year in full." *Rodríguez Narváez v. Nazario,* 895 F.2d 38, 45 (1st Cir.1990); see *Morán Vega v. Cruz Burgos,* 537 F.3d 14, 22 (1st Cir.2008). One way for the statute to toll is for the plaintiff to make an "extrajudicial claim." P.R. Laws Ann. tit. 31, § 5303 ("Prescription of actions is interrupted by their institution before the courts, by extrajudicial claim of the creditor, and by any act of acknowledgment of the debt by the debtor."). "[A]n extrajudicial claim does in fact include virtually any demand formulated by the creditor [plaintiff]." *Rodríguez Narváez v. Nazario,* 895 F.2d at 44. The only requirements of an extrajudicial claim are (1) that the claim be made by the holder of the substantive right (or his counsel); (2) that it be addressed to the debtor, not to a third party; and (3) that it demand the same conduct or relief ultimately sought in the subsequent suit. *Moran Vega v. Cruz Burgos,* 537 F.3d at 21 (citing *Rodríguez v. Nazario,* 895 F.2d at 44).

#### B. Commencement of the Statute

■ "The statute begins to run "from the time the aggrieved person had knowledge thereof." P.R. Laws Ann. tit. 31, § 5298." *See Report and Recommendation* (Docket No. 228). "That one-year time clock begins to tick on the day after the date of accrual of the claim (*Carreras–Rosa v. Alves–Cruz,* 127 F.3d 172, 175 (1st Cir.1997, *per curiam* )). *Santos Espada v. Cancel Lugo,* 312 F.3d 1, 4–5 (1st Cir. 2002). "For accrual purposes, the injured person must have both **notice of her injury and knowledge of the likely identity of the tortfeasor** (*Tokyo Marine & Fire Ins. Co. v. Perez & Cia., de Puerto Rico, Inc.,* 142 F.3d 1, 3 (1st Cir.1998).)" (Emphasis added). *Santos Espada,* 312 F.3d at 4–5. In *Kaiser v. Armstrong World Indus., Inc.,* 872 F.2d 512, 516 (1st Cir. 1989), the Court held:

**"Notice of an injury" occurs when there exist some outward or physical signs through which the aggrieved party may become aware and realize that [s]he has suffered an injurious**

**aftereffect, which when known becomes a damage even if at that time its full scope and extent cannot be weighed.** These circumstances need not be known in order to argue that the damage has become known, because its scope, extent and weight may be established later on during the prosecution of the remedial action. (Citations omitted). (Emphasis added).

■ "If a plaintiff is not aware of some level of reasonable likelihood of legal liability on the part of the person or entity that caused the injury, the statute of limitation will be tolled." *Santos Espada,* 312 F.3d at 4. "But the limitations period can begin to run not simply when a claimant gains 'actual knowledge' but an earlier date when 'by due diligence, such knowledge would likely have been acquired' *Rodriguez–Suris v. Montesinos,* 123 F.3d 10, 16 (1st Cir.1997), quoting *Villarini–Garcia v. Hospital Del Maestro, Inc.,* 8 F.3d 81, 84 (1st Cir.1993)." *Santos Espada,* 312 F.3d at 4. "In cases where a tort claim is filed beyond the one-year statutory term, plaintiff bears the burden of proving timeliness by establishing that she lacked the necessary knowledge or imputed knowledge before instituting the action *Torres v. E.I. Dupont De Nemours & Co.,* 219 F.3d 13, 19 (1st Cir.2000)." *Santos Espada,* 312 F.3d at 4.

■ In the instant case, it is clear from the date plaintiff was discharged from Auxilio Mutuo, on January 10, 2001, that the tracheostomy tube need to be removed. The record shows that, on January 11, 2001, plaintiff Rosa, very diligently, went to the General Hospital Center at Passaic, New Jersey, to have the tube removed. *See* Docket No. 199, Exhibit No. 1. Plaintiffs also knew since January 11, 2001, that the tracheostomy tube could not be removed. *See* Docket No. 199, Exhibit No. 1. This prognosis was confirmed on January 19, 2001 when Rosa was evaluated by Dr. Cece, and was informed that the tracheostomy tube could not be removed due to prior treatment received at Auxilio Mutuo. *See* Docket No. 199, Exhibit No. 1. Indeed, as suggested by Dr. Cece on January 19, 2001, further medical proceedings were performed on plaintiff. In addition, plaintiff was evaluated by other physicians, as recommended by Dr. Cece after his initial evaluation. *See* Docket No. 199, Exhibit No. 1. Hence, even assuming *arguendo* that plaintiff Rosa did not know the full extent of the damage at the time she was first evaluated by Dr. Cece on January 19, 2001, she certainly had "notice of the injury," as she knew that her prognosis was poor, and that the tortfeasor was the Auxilio Mutuo.

It is also important to note the medical findings made by Dr. Cece, and his medical impression of Rosa when he first evaluated her on January 19, 2001. The Court bears in mind Dr. Cece's finding that "laryngeal subglottic stenosis can result from short periods of intubation of only one to two days." *See* Docket No. 199, Exhibit No. 1. Hence, according to Dr. Cece's medical opinion, the fact is that the condition that later impaired plaintiff's removal of the tracheostomy tube may have developed on the same day that she was intubated. *See* Docket No. 199, Exhibit No. 1.

Another finding made by Dr. Cece that bears consideration and it is worth mentioning is that the only medical remedy may be reconstructive laryngeal tracheal surgery, but unfortunately due to Rosa's medical condition, complex reconstructive surgery of the laryngeal tracheal was not recommended in her case. *See* Docket No. 199, Exhibit No. 1. Aside from the fact that "surgery is not always successful." *See* Docket No. 199, Exhibit No. 1.

■ After a careful review of the record, the Court finds that the instant action is time barred, as plaintiffs knew, at least

from January 19, 2001, when Dr. Cece first evaluated Rosa, that the removal prospective of the tracheostomy tube was poor. The record further shows that plaintiffs' counsel sent a letter dated February 26, 2002 to the Auxilio Mutuo requesting damages in the amount of two million dollars ($2,000,000.00). *See* Docket No. 199, Exhibit No. 4. Plaintiffs' letter provides as follows:

> The patient makes a claim for the damages described above, which shall be duly detailed or updated, for the sum of two million dollars ($2,000,000.00). Said claim is made in good faith and as a transaction offer for the cause at hand.

*See* Docket No. 199, Exhibit No. 4. The record shows that the complaint followed on September 6, 2002. The Court finds, however, that the letter of February 26, 2002 did not toll the one year statute of limitations under Puerto Rico law, 31 L.P.R.A. § 5298, as alleged by plaintiffs, as more than one year had elapsed since Rosa had notice of the injury on January 19, 2001. Hence, the complaint filed on September 6, 2002, on diversity grounds, is time barred, as it was filed after the one year statute of limitations under applicable Puerto Rico law, 31 L.P.R.A. § 5298, had elapsed.

For the reasons set forth above, the motion for summary judgment filed by Drs. Garratón, González and Portela, and Auxilio Mutuo (Docket No. 197), is GRANTED.

### Conclusion

In view of the foregoing, the Magistrate Judge's *Report and Recommendation* (Docket No. 228), is adopted in part, as supplemented herein, as the Court finds that the instant action is time barred. Hence, the motion for summary judgment filed by Drs. Garratón, González and Portela, and Auxilio Mutuo (Docket No. 197), is granted.

In addition, the Magistrate Judge's *Report and Recommendation* (Docket No. 229), granting summary judgment as to Drs. Garratón, Portela and González (Docket entries No. 196, 200 and 201), is hereby adopted *in toto*, as a review of plaintiffs' objections are just a rehash of prior arguments, in addition to the fact that the instant action is time barred. "The Court need not go further for it refuses to write at length to no other end than to hear its own words resonate as to the instances alleged as errors by plaintiff." Where as here, a [Magistrate] has produced a first-rate work product, a reviewing tribunal should hesitate to wax longiloquence simply to hear its own words resonate. *See Lawton v. State Mut. Life Assu. Co. of Am.*, 101 F.3d 218, 220 (1st Cir.1996); *In Re San Juan Dupont Plaza Hotel Fire Litig.*, 989 F.2d 36, 38 (1st Cir.1993). Judgment will be entered accordingly.

IT IS SO ORDERED.